Hubert Ray BOTEN, Sanford W. Boten, and Wesley Boten, (Plaintiffs) Respondents-Appellants,

v.

Joseph BRECKLEIN and Clarence Fell, (Defendants) Appellants-Respondents.

No. 54316.

Supreme Court of Missouri, Division No. 1.

March 9, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied April 13, 1970.

Thos. J. Conway, Kansas City, for respondents-appellants (plaintiffs); Popham, Popham, Conway, Sweeny & Fremont, Kansas City, of counsel.

Alder & Rixner, John J. Alder, Shawnee Mission, Kan., Wiley W. Morrison, Raytown, for appellants-respondents (defendants).

HOLMAN, Judge.

This case arises out of a Managers Agreement relating to three Jackson County, Missouri, oil leases entered into between plaintiffs and defendants on April 17, 1963. The agreement was terminated by defendants on July 8, 1964. Plaintiffs' petition is in three counts. Count I sought actual and punitive damages for alleged fraud of defendants in obtaining plaintiffs' interests in the leases. Count II sought damages for breach of the contract, and Count III alleged that plaintiffs were entitled to recover on quantum meruit. At the conclusion of the evidence the court sustained defendants' motion for a directed verdict on Counts I and III. The jury returned a verdict for plaintiffs on Count II in the amount of $95,000. Defendants have appealed from that judgment. Plaintiffs have appealed from the judgment for defendants on Count I.

Plaintiffs have filed a motion to dismiss the appeal of defendants, alleging that their brief fails to comply with Civil Rule 83.05(c), V.A.M.R. That motion is overruled.

The transcript in this case contains more than 1,100 pages. Much of the evidence relates to the issue as to whether plaintiffs performed the conditions of the managers agreement in the operation of the leases. There was considerable evidence to the effect that they did properly perform, and defendants offered a great deal of evidence which would warrant a finding that they did not. The jury found that issue in favor of plaintiffs. We see no reason for including that evidence in our factual statement. Also, as will hereinafter appear, we will not consider plaintiffs' appeal relating to Count I. We will therefore endeavor to omit facts relating solely to that Count.

Since plaintiffs prevailed in the trial court the facts, to a large extent, will be stated in the light most favorable to them. Matters here involved concern oil leases upon the Longview, Nave, and Jones farms located in Jackson County, Missouri, constituting a total of 2,000 acres. The leases were obtained in 1944 by Raymond Bradford who originally discovered oil thereon and operated the leases until 1961. In that year the leases were assigned to Jacomo Oil Company which had recently been formed. Bradford owned 34 shares in the company, Isaac Zoglin, who agreed to furnish the money for further development, owned 34 shares, and plaintiffs Ray and Sanford Boten each owned 17 shares. The Botens paid no money for their shares but received them for work they had performed, and agreed to perform, in operating the leases. In 1963 Zoglin purchased Bradford's stock so that he had a total of 68 shares, but at that time he agreed that after he was reimbursed for his expenditures he would convey 17 shares to the Botens so that they would own one half of the stock. The Botens drilled three wells for Jacomo which were all producers, and there were 20 old wells, some of which were still producing when Jacomo took over the leases.

In late 1962 Ray Boten became acquainted with defendant Fell while drilling some

gas wells for him in Clinton County, Missouri. They discussed the matter of Fell purchasing Zoglin's interest in the leases, or in the corporation. In April 1963 Ray approached Zoglin and discussed the purchase of his interest with the result that an agreement was worked out whereby Zoglin would cause the corporation to sell the leases to Ray for $31,000, with the Botens to surrender their stock in Jacomo so that Zoglin would get all the money. Plaintiffs had an understanding with Fell and his partner, defendant Brecklein, that Ray would immediately transfer the leases to them and that they would furnish the $31,000. In consummating the transaction Attorney William Brandom, a friend and neighbor of Fell, prepared the contract here in question and some of the other papers, and Attorney Kenneth Simon represented Jacomo and Zoglin. There was evidence that the Botens claimed that they should retain a half interest in the leases but that Brandom and Fell stated that could not be done because of tax matters and that they (the Botens) would have to be silent partners. At any rate, the management contract was entered into whereby plaintiffs were to manage the leases without compensation and would have an opportunity to obtain a one-half interest later under provisions of the contract herein set out. Provisions of the management contract that are particularly pertinent to the issues of this case are as follows:

"1. Managers [plaintiffs] shall be responsible for the pumping, treating, gathering, collection, storing, distribution, loading and delivery of oil, including the operation and maintenance of equipment used in connection therewith; but, Managers shall not incur any expense without the approval and consent of Lessees.

"2. Lessees shall, in the event and at such time as all of the conditions of this Agreement having been complied with and total receipts from the gas and oil produced on the above-mentioned premises shall equal the total amounts expended, including, but not limited to, capital expenditure, royalty payments, drilling expenses, maintenance production and marketing expenses, taxes, in connection with the developments and operation thereof, plus the sum of Thirty-One Thousand ($31,000.00) Dollars. Then Lessees shall assign to Managers an undivided One-Half (½) interest in the leases on said premises, together with equipment thereon, owned by Lessees and used or useable in connection with the operations.

"3. Managers may, during the term of this Agreement, at their option and upon payment of a sum equal to One-Half (½) of the total amounts expended by Lessees less receipts as stated in Paragraph 2 hereof, purchase the undivided One-Half (½) interest as provided in Paragraph 2 hereof.

"4. The Managers shall operate the property covered hereby in an efficient, economically and workmanlike manner and at all times shall be subject to all valid rules and regulations of any duly constituted authority having jurisdiction in the premises.

*   *   *   *   *   *

"6. Drilling of additional holes by Managers will be conducted under such terms and upon such terms including compensation as may be then mutually agreed by the parties.

*   *   *   *   *   *

"8. If the Managers fail to perform the obligations contained in Paragraph 1 hereof for a period of Sixty (60) days, then this Agreement shall be void and of no further effect.

*   *   *   *   *   *

"11. It is the contemplation of the parties, notwithstanding anything hereinabove expressed, that the interest of Managers as provided in Paragraphs 2 and/or 3 hereof, is contingent upon complete performance of the conditions herein expressed and default in any of the

conditions there expressed voids this Agreement and the Managers shall receive nothing therein by quantum meruit or otherwise. Managers shall acquire no vested interest in the premises until the conditions of Paragraphs 2 and/or 3 are complied with."

Wesley and Ray Boten had been drilling wells of various kinds since 1941. Sanford had worked through the years on a regular job and only worked with his brothers on the two days a week he had available. Shortly after starting the management of these leases plaintiffs entered into an oral agreement with defendants to drill additional wells at a total cost of $2.00 a foot. It is perhaps of interest to state that on these leases it was only necessary to drill shallow wells as oil was generally found at a depth of from 250 to 300 feet. During the time plaintiffs managed these leases they drilled 15 additional wells, all of which were producers. The receipts from the sale of oil increased from $697.00 in June 1963 to more than $5,000.00 in the month of May 1964. Thereafter, until April 1968, the receipts averaged about $3,000.00 a month.

As we have indicated, there was considerable conflict in the evidence on the issue as to whether plaintiffs operated the leases in an efficient, economical, and workmanlike manner. We have said that we will not state that evidence in detail. It is sufficient to summarize that plaintiffs' testimony indicated that they operated the leases efficiently and kept the premises clean and in good condition, but that the production was not increased to a greater extent because defendants would not permit them to drill more wells; that defendant Fell was continually turning off the wells and reducing production. On the other hand, it was the evidence of defendants that plaintiffs wanted to drill wells but not do any other work; that production was not increased because they would not lay the pipes and do other work necessary to get the wells into production; and that they did not clean up the premises and do

other managerial work required under the contract.

As a result of the conflicting views of the parties the defendants, on July 8, 1964, caused their attorney to write the following letter to plaintiffs:

"On behalf of our client, Joseph Brecklein and Clarence Fell, you are advised that due to your failure to perform the conditions of the agreement entered into by and between yourselves and Joseph Brecklein and Clarence Fell dated April 17, 1963, particularly paragraphs 1 and 4 thereof, said agreement is terminated immediately. A formal demand is made hereby that you cease operations on the premises subject to said agreement immediately."

Upon receipt of that letter plaintiffs employed an attorney, Keith Wilson, who immediately advised Mr. Brandom that plaintiffs would like to know the deficiencies defendants complained of, and that plaintiffs were willing to correct any and all such deficiencies. Plaintiffs received no cooperation from defendants toward working out an adjustment. At one time their attorney indicated to Brandom that plaintiffs were interested in buying the interest of defendants but were advised that Mr. Fell was not interested in selling at any price.

At the time of the termination the total amount defendants had invested in the project, after deducting receipts, was $67,-438.00. In April 1968, the conclusion of the five-year period, the amount of defendants' investment was $66,575.00.

Defendants did not drill any more wells after August 4, 1966, because they entertained the view that the new Missouri Oil Law which went into effect about that time would so greatly increase the cost of operations that no additional wells should be drilled. In rebuttal plaintiffs produced as witnesses the State Geologist, and a former employee of that department, who testified that operations under the new

Missouri Oil Law would not greatly increase expenses.

As will hereinafter more fully appear it was the contention of plaintiffs that the measure of damages in this case was the value of a one-half interest in the leases on July 8, 1964. Therefore, they presented considerable evidence concerning the value of the leases and the time it would take to produce the oil underlying the land involved. In that connection there was testimony relating to the process of waterflooding. Waterflooding is a process whereby holes are drilled and water is forced into the oil sand at various distances from the oil wells and the pressure produced will cause the oil to be recovered much quicker and in larger quantities. Plaintiffs testified that they frequently requested of defendant Fell that he authorize waterflooding but he said it wasn't necessary and that they couldn't produce too fast because of the tax consequences. Fell, who has spent most of his life looking for oil and gas, testified that defendants were still planning to waterflood the leases in question and that they "have worked toward waterflooding from the very beginning."

Ray Boten testified that the value of a one-half interest in the leases on July 8, 1964, was $150,000.00. Roy Williams, Kansas Production Foreman for Apco Oil Company, looked at the leases in June 1964 with the view of acquiring them for his company. He testified that Apco would have waterflooded the field if it had acquired it and that such would have cost approximately $1,000 per acre. He did not place a value on the leases but, in answer to a hypothetical question, stated that without waterflooding defendants should have been able to recover their $31,000.00, plus operating expenses, within three or four years.

Carl Pate, an experienced consulting oil engineer, testified that he had made an evaluation study of this field from core analyses, driller's logs, and other information, and estimated that there were 1,800,000 barrels of oil under 200 acres of the land, and expressed the opinion that the value of the leases in July 1964 was $264,336.00. A letter received by Ray Boten, dated September 18, 1964, from Kewanee Oil Company of Tulsa, Oklahoma (hereinafter called "Kewanee"), was admitted in evidence. Therein the Company offered to purchase the leases for $240,-000.00 cash, or "$200,000.00 cash plus an oil payment of $200,000.00 out of one-eighth of seven-eighths W.I."

Neil A. Taylor, Petroleum Engineer for Kewanee, inspected the property in September 1964 and also obtained two core analyses, maps, driller's logs, and two oil samples, and worked up an evaluation of the leases and testified that the fair market value of the leases was the same as the offer made by Kewanee.

Robert Gray, who was in charge of purchasing producing properties for Kewanee and who signed the letter making the offer, testified that the offer made was his judgment of the market value of those leases at that time.

Defendants did not offer any evidence concerning the value of the leases.

In order to indicate at the outset the theory of plaintiffs' case we will set out the submission and damage instructions, as follows:

"Instruction No. 3

"Your verdict must be for plaintiffs if you believe: First, plaintiffs were substantially performing their obligations under the management contract dated April 17, 1963, and Second, defendants wrongfully terminated the said management contract before plaintiffs could complete their performance thereof, and Third, by so terminating the said management contract, defendants failed to substantially perform their obligations thereunder, and Fourth, plaintiffs were thereby damaged."

"Instruction No. 6

"If you find the issues in favor of plaintiffs, then you must award the plaintiffs such sum as you believe will fairly and justly compensate plaintiffs for any damages you believe they sustained as a direct result of the defendants' termination of said contract."

The court gave the only instructions offered by defendants. They were No. 4, which conversed the first paragraph of No. 3, and No. 5 which was a withdrawal instruction concerning issues and evidence that related to Count I.

The first point briefed by defendants is that the trial court erred in overruling defendants' motion for judgment in accordance with their motion for a directed verdict at the close of all the evidence or, in the alternative, for a new trial. The subpoints primarily assert that plaintiffs cannot recover because they did not comply with conditions precedent in the contract and that there was insufficient evidence of damages or a competent measure of damages.

Defendants take the position that plaintiffs are not entitled to recover anything because they (defendants) were entitled to recover back their original investment, plus all amounts expended by them in operating the leases within the five years following April 17, 1963, before plaintiffs were entitled to the half interest. It is indicated that plaintiffs could have paid one half of that total at any time within the five-year period and thus have received one half of the leases and equipment. Plaintiffs made no such offer, and, it is difficult to understand how defendants could take the position that plaintiffs had any such right after they (defendants) had terminated the agreement because of the alleged failure of plaintiffs to perform the conditions of the contract. It is certainly understandable that plaintiffs, after July 8, 1964, would not attempt to enforce that provision of the contract because, if such had been done, they would have been full operating partners with men who had developed a hostile attitude toward them and their performance of their duties under the agreement. In that situation litigation would likely have followed.

Defendants have cited cases which state the well-known rule that a promise based upon a condition cannot be enforced as such until the contingency upon which it depends has occurred. Parker-Washington Co. v. Dennison, 267 Mo. 199, 183 S.W. 1041; McIntyre v. Kansas City, 237 Mo. App. 1178, 171 S.W.2d 805. The difficulty with defendants' contention relating to conditions precedent is that they fail to recognize that this is a suit for breach of contract and not to enforce the contract. Of course, defendants are no doubt led into taking that position by the fact that plaintiffs have claimed throughout that their measure of damages is the value of a one-half interest in the enterprise as of July 8, 1964.

We do not agree with defendants' contentions. This is not the usual case of breach of contract wherein one of the parties fails to perform or carry out one or more of the contract provisions. This is a case where defendants have wrongfully (according to the jury finding) terminated the contract and have notified plaintiffs to cease operating the leases. In that situation defendants are in no position to insist that the plaintiffs must comply with conditions precedent in the contract. It is elementary that a party to a contract cannot claim its benefit where he is the first to violate it. Rexite Casting Co. v. Midwest Mower Corp., Mo.App., 267 S.W. 2d 327; Motor Port, Inc. v. Freeman, Mo. App., 62 S.W.2d 479.

In their reply brief defendants contend that plaintiffs cannot assert the breach of defendants as an excuse for their failure to comply with the contract provisions because such is an affirmative defense and was not pleaded. There is no merit to that contention. Plaintiffs having alleged defendants' wrongful termination

of the agreement, and defendants having denied the breach in their answer, it was unnecessary for plaintiffs to plead further in order to assert that further performance on their part was excused by defendants' breach.

We will next consider questions concerning damages and the measure of damages. As we have stated, plaintiffs contend that the measure is the market value of a one-half interest in the leases on July 8, 1964. There is considerable authority supporting that view. General rules applying to the measure of damages for breach of contract are stated as "the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed * * *. Compensation is the value of the performance of the contract; the person injured is, as far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed. He is entitled to the benefit of his bargain, that is, whatever net gain he would have made under the contract. The damages awarded must fully compensate the injured party. * * * where one party to a contract repudiates it, the other party is entitled to recover the value of the contract to him at the time of its breach or the value of the promised performance, or the value of the benefit contracted for." 25 C.J.S. Damages § 74, pp. 843, 846–849. See also Little v. Mercer, 9 Mo. 218, McManama v. Dyer, Mo.App., 176 S.W. 1101, and Ebberts v. Carpenter Production Co., Tex.Civ.App., 256 S.W.2d 601 [13, 14]. However, we agree with the contention of defendants that in a breach of contract action "[t]he law will not place plaintiff in a better position than he would have been had the contract been completed on both sides." Dingman v. Elizabeth Arden Sales Corp., Mo.App., 284 S.W.2d 16, 18 [2]. Therefore, it would appear that, in any event, plaintiffs were not entitled to recover more than one half the value of the leases on July 8, 1964, less one half the

amount defendants had advanced to that date, i. e., $33,719.19.

It is not necessary, however, that we precisely delineate the measure of damages in this case. This for the reason that the court gave Instruction No. 6, supra (MAI No. 4.01 modified), (1964 Ed.) which was the only approved damage instruction available. It is a short, simple, general instruction which directs an award which will fairly compensate plaintiffs for their damages. It is contemplated by MAI that where a general instruction of this kind is given the jury will be properly advised by the argument concerning details. If the attorneys disagree as to the elements of and proper measure of damages any questions raised should be settled by the court either at the instruction conference or by its rulings upon objections made during the course of the argument. No complaint is made as to any ruling of the court concerning the argument relating to damages and we will accordingly assume that no error occurred in that regard.

It would seem appropriate at this point to consider the contention of defendants that the court erred in giving Instruction No. 6, supra. They first say that MAI 4.01 is applicable only to tort actions and should not have been used in a breach of contract case; also, that it is too general to be a proper guide for the jury. They cite Red-E-Gas Co. v. Meadows, Mo.App., 360 S.W.2d 236, in which a general damage instruction was held prejudicially erroneous in a breach of contract case. That case is not applicable, however, because it was decided before MAI. In Stamm v. Reuter, Mo.App., 432 S.W.2d 784, the court held that it was not error to use MAI 4.01 in a breach of contract case. We agree that, at least until a more detailed form is provided in MAI, it is appropriate to use 4.01. Moreover, if defendants were of the view that there was no applicable MAI form and that the one offered was too general it was their duty to offer a more specific one. Miller v. Ranson and Co., Mo.App., 407 S.W.2d 48. Defendants also

say that the instruction does not follow form 4.01. Since this ground of objection was not made at the trial, nor included in the motion for new trial as required by Civil Rule 70.02, it is not preserved for review. As indicated, we rule that the court did not err in giving Instruction No. 6.

Defendants' next point is that plaintiffs failed to prove actual damages, or a competent measure of damages. They first say this is true because plaintiffs failed to allege and prove that defendants had the duty or ability to develop the leases so that they could recover their expenditures within the five-year period and therefore plaintiffs were not damaged by the alleged breach. We do not agree with that contention. It was alleged and proved that defendants agreed to advance money for the development of the leases. The amount was not agreed upon. We agree with defendants' assertion that they were not required to support a crash drilling program involving day-and-night drilling with a number of rigs. However, we think the understanding should be construed as requiring defendants to furnish the means for the reasonable development of the leases. Mr. Fell testified that the five-year limitation was agreed upon as a period which would allow plenty of time for the development of the leases. Of course, under our view that the recovery of plaintiffs would be limited to one half the value of the leases on the date of termination, less one half the advancements, it would not seem to be required that plaintiffs prove that the recovery of defendants' expenditures could reasonably have been accomplished in five years. Even if we assume, however, that such was required, we think there is ample evidence from which the jury could reasonably have found that a reasonable development of the leases would have accomplished that result. Certainly plaintiffs are not bound by the actual results of defendants' operations after the contract was terminated.

The next subpoint is that the allegations and evidence as to damages are "vague, confusing, speculative, incompetent, and indefinite as to any legal measure of damages or actual damages to which plaintiffs have a legal right." We have heretofore discussed the measure of damages and plaintiffs' theory of the case. Since defendants did not file a motion to make the petition more definite and certain we think the general allegations as to damages were sufficient. Also, we do not consider plaintiffs' proof as to the market value of the leases to be vague or indefinite. We need not repeat the evidence shown in our statement of facts. It is sufficient to say that there was expert testimony concerning market value of the leases which varied from $240,000 to $300,000 and, on a partial royalty basis, $400,000. And, it should also be noted that some of these opinions were for only a small part of the total acreage. Defendants' argument on this point deals largely with the type of proof ordinarily required in breach of contract cases. The case before us involves a very unusual contract and the cases cited, such as Tnemec, Inc. v. North Kansas City Development Co., Mo.Sup., 290 S.W.2d 169, are not applicable. In another subpoint defendants state that the drilling of additional holes was subject to terms to be mutually agreed upon. The effect, if any, that this statement would have on the issue of damages has been determined by rulings heretofore made. As indicated, we rule that the evidence as to damages was sufficient to support the submission.

Defendants have also briefed the point that plaintiffs are barred from recovery because they failed to mitigate damages by exercising their option to purchase a one-half interest in the leasehold under the terms of the agreement. This point is obviously without merit. As we have said heretofore (1) defendants are in no position to contend that plaintiffs should have attempted to proceed under the agreement after they (defendants) had terminated it, and (2) plaintiffs should not have been required to exercise an option which would

have made them operating partners with men who had developed a hostile attitude toward them.

The next contention is that the court erred in admitting incompetent evidence in a number of respects. It is first said that it was error to permit Ray Boten to testify that a one-half interest in the leasehold had a value of $150,000 without proper foundation or showing of qualifications. As we have heretofore stated, Ray had had years of experience in oil fields and operated these leases from 1961 to 1964. His testimony demonstrates that he has considerable knowledge in that area. Moreover, we have frequently held that an owner is qualified to give an opinion as to the value of his property. State ex rel. State Highway Commission v. Northeast Building Co., Mo.Sup., 421 S.W.2d 297. Technically speaking, Ray may not have been an owner of these leases, but he had previously been (through stock holdings) an owner of a part interest and certainly had an interest under the agreement here involved. And it should be noted that under Count I plaintiffs claimed to own a half interest in the leases. There is a certain amount of discretion vested in the trial court in regard to the admission of opinion evidence and we accordingly rule that it was not error to admit the testimony here complained of.

Complaint is also made concerning the admission of certain testimony given by experts Roy Williams and Carl Pate. Apparently defendants are objecting to the fact that these witnesses were permitted to give testimony relating to the process of waterflooding in arriving at an opinion as to the time required for development and the value of the leases. We rule that the evidence was competent. The fact that the waterflooding process could have been profitably used in the development of this field had a definite relationship to the value of these leases. It is also contended that it was error for Mr. Pate to testify that 214.7 acres of the leasehold had a value of $264,336.00 without the evaluation

covering the entire 2,000 acres. The witness expressed the view that there was oil under some of the remaining acreage but that he had not computed its value. While we cannot understand how defendants could have been prejudiced by the failure of the witness to put a valuation on the entire lease we will not rule this point because no objection on that ground was made at the time the testimony was admitted.

The next contention of defendants is that the court erred "in permitting witnesses Gray and Taylor to testify for plaintiffs by deposition over objections of defendants, based on incompetent hearsay and conclusions of others with no factual foundation and permitting them to set a value upon the leasehold based on a cash offer made to plaintiff Boten on a limited basis, all of which was highly prejudicial and incompetent." As we have heretofore stated, Neil Taylor inspected this property and while there obtained two core analyses, maps, driller's logs, and two oil samples. He had the Earlougher Engineering Laboratory run a viscosity test on the oil samples. From all of this information he prepared an evaluation of the leases fixing the cash value at $240,000.00. All of this material was then submitted to Mr. Gray, who likewise concluded that the value was $240,000.00, and then wrote the letter making the offer to Ray Boten. There is no basis for the contention in the quoted point that these witnesses set a value based on that cash offer. The reverse is true. The offer was made after these two witnesses had arrived at an opinion as to the value of the leases.

The precise question presented is whether the court committed prejudicial error in admitting the deposition testimony of these two experts which was based, in part, on laboratory reports and other information obtained by Taylor. The viscosity curve and core analyses were available at the time the depositions were taken in Tulsa, and could have been used by defendants' attorney in cross-examination if he had so

desired. Also, after the other items that may have been considered by these witnesses had been more specifically identified, plaintiffs' attorneys wrote defendants' attorney, on July 3, 1968 (about two weeks before trial), and offered to make these witnesses available at any time during the week of July 8, 1968, for depositions so that any additional cross-examination desired could be accomplished.

■ We have decided that we need not determine this point because, even if we assume that the admission of this opinion testimony was error, we have the view that it was not prejudicial. We base this conclusion upon the rule that the admission of improper evidence is harmless where the fact thereby sought to be shown is otherwise fully and properly established. Hunter v. St. Louis-Southwestern Ry. Co., Mo. Sup., 315 S.W.2d 689 [5]; Harris v. Goggins, Mo.Sup., 374 S.W.2d 6 [11].

The point relied on seems to be directed to the admission of the entire deposition of each of these witnesses. The objections made would not warrant the exclusion of the entire deposition and we will therefore assume that the complaint is directed to the opinions as to the value of the leases these witnesses were permitted to express. We say this testimony was not prejudicial because there was properly in evidence the letter in which one of the witnesses, Gray, offered on behalf of Kewanee, to purchase the leases for $240,000.00, the same amount he testified was their value. There was evidence that he made the offer upon the basis of information furnished him by the other witness, Taylor. Certainly, where there is evidence that, as a result of the joint efforts of these witnesses, an apparently bona fide offer to purchase was made for a certain amount it could not prejudice defendants that the court may have erroneously admitted testimony that these witnesses were of the opinion that said amount was the market value of the leases. Moreover, Mr. Gray testified in two separate instances, without objection, as to the offer and the amount thereof. Furthermore, two other witnesses gave testimony which fixed the value of the leases at more than the cash value expressed by witnesses Gray and Taylor.

■ We are aware of the fact that defendants objected to the admission of the letter and, in the argument portion of the brief, contend that the court erred in admitting it because a purchase offer is not admissible in this type of case. The difficulty with this situation is that the ground asserted here is raised for the first time in the brief. The objection in the trial court was that "an offer to purchase under their particular circumstances without the qualification that it is a standard type price and they used standard methods of appraisement is invalid. The other bad thing about the offer is that it was made by letter, which had some eight or nine conditions attached to the offer." The objections made were properly overruled because they were not valid reasons for excluding the offer entirely. The objections made did not present to the trial court the unqualified proposition that an offer to buy is not competent evidence of the value of property. It is well established that a ground for objection will not be considered on appeal where it was not the ground assigned in the trial court. Parker v. Wallace, Mo. Sup., 431 S.W.2d 136 [10]. Moreover, the point that the court erred in admitting the letter is not preserved for review in this court because it is not mentioned in the "Points Relied On" and is advanced for the first time in the argument portion of the brief. Hastings v. Coppage, Mo.Sup., 411 S.W.2d 232 [4]. Therefore, as indicated, we rule that the evidence of the offer to purchase was properly before the jury for its consideration.

For the various reasons heretofore mentioned we rule that no prejudicial error resulted from the admission of the evidence complained of.

Defendants also contend that the court erred in giving Instruction No. 3, supra, but the objections raised in the brief were not made at the trial or included in the motion for new trial and therefore are not preserved for review.

The final point is that the verdict of $95,000 is excessive and shows bias and prejudice on the part of the jury. We find nothing in the transcript to indicate any misconduct on the part of the jury. Moreover, we cannot see that the verdict is excessive. We need only refer to the testimony of Carl Pate who placed a value of $264,336.00 on a portion of the acreage. If we deduct from that the amount advanced by defendants before termination, i. e., $67,438.00, we have a net value of $196,-898.00. One half of that sum is $98,449.00. That testimony is sufficient to show that the judgment is not excessive.

At the time of oral argument counsel for plaintiffs stated that if we affirmed the judgment on Count II he did not desire a decision on plaintiffs' appeal from the judgment on Count I. We accordingly dismiss plaintiffs' appeal.

The judgment is affirmed.

SEILER, P. J., and LASKY, Sp. J., concur.

STORCKMAN, J., not sitting.