ARTCRAFT CABINET, INC., a Missouri
Corporation, Respondent,

v.

WATAJO, INC., et al., Appellants.

No. KCD 27185.

Missouri Court of Appeals,
Kansas City District.

July 6, 1976.

Motion for Rehearing and/or Transfer
Denied Aug. 2, 1976.

Application to Transfer Denied
Oct. 12, 1976.

**920**

James S. Cottingham, Cottingham, Williamson, Gibson & Leonard, Independence, for appellants.

Warren S. Stafford, Taylor, Stafford & Gannaway, Springfield, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SHANGLER, Presiding Judge.

The plaintiff ArtCraft, Inc. sued Summit Homes [a commonalty of eight domestic corporations doing business as a general partnership] for a mechanic's lien and contract damages. Summit counterclaimed for breach of contract. The causes were tried to the court and a judgment was returned for ArtCraft for $33,050.56 and against Summit on the counterclaim. The court also found that ArtCraft had abandoned its pleading for a lien on the premises.

The defendant Summit, as general contractor, planned the construction of the Glendale Gardens apartment complex in Independence, Missouri. ArtCraft, a manufacturer of prefabricated cabinets, bid on the project, and on October 29, 1970, was awarded the subcontract to provide and install kitchen and bath vanities for 280 apartment units and a clubhouse. Shop drawings prepared by ArtCraft had been submitted to Summit with the bid. The total contract price was $89,595.

The contract provided in paragraph III for ArtCraft "[t]o begin the work herewith contracted for as soon as the project upon which the work required is ready for such or within 10 calendar days after the contractor has given notice of work or material requirements and to complete the several portions of the whole thereof within the time or times following namely: . . .". The blank space which ensued was not completed.

In January of 1971, the various subcontractors [including the plaintiff ArtCraft] met with the Summit representative to establish the production schedule. According to this schedule, ArtCraft was to start installation in building 12 of the complex on March 18, 1971, and was to follow the painters and trim carpenters who were to have finished by that date. ArtCraft was to be allowed ten working days to complete the job. Instead, the first delivery of cabinets by ArtCraft did not take place until May 11.

The project had not started on schedule and Jones, the Summit general manager, testified that the apartment units in building 12 were probably not ready for cabinets on March 18. ArtCraft had made field measurements in March and found that there was no sheetrock on the walls and that the building was definitely not ready for the installation of cabinets. According to Jones, building 12 was finally ready for cabinets in early April and so informed ArtCraft by telephone. Jones wrote to Allison, the ArtCraft sales representative, on April 6 that plaintiff was to begin installation on April 14, 1971. ArtCraft, however, could not properly proceed with fabrication of the cabinets until the shop drawings were approved. They had been submitted with the bid and remained with Summit until April; they had not been returned either approved or disapproved, by the architect. In another letter to ArtCraft, this one dated April 22, 1971, Jones informed ArtCraft that their drawings had not been approved and would have to be resubmitted. Jones added that time was of the essence, since time for installation was nearly at hand.

ArtCraft sales representatives Allison and Cotton, who did cost analysis and field measurements for the plaintiff, met with the Summit architect and drawings were devised to the satisfaction of the architect. They were ultimately approved by Richardson, the Summit job superintendent. As of May 4, 1971, however, ArtCraft had yet to receive approval of the shop drawings and on that date Cotton wrote Summit that until such was forthcoming, ArtCraft could not manufacture any cabinets. That same day [in a letter which crossed], Jones wrote ArtCraft that Summit would treat the contract as breached unless the plaintiff was on site for installation work on May 5.

It was the testimony of Ms. McGauvran, ArtCraft president, that Jones telephoned her on May 5 or 6 and intimated that ArtCraft was unable to furnish the cabinets for the project as agreed. She, in turn, insisted the work would be done but that approved drawings were needed first. It was her testimony [not recalled by Jones] that he agreed to guarantee the drawings would be sent if ArtCraft delivered the cabinets. Ms. McGauvran acceded to a May 11 delivery date and confirmed this commitment by telegram that day. Thus, although the approval of the architect was not received, the cabinets were manufactured and delivered on May 11 as agreed.

The vexations, however, did not abate. The first site for installation, building 12, did not conform to the original plans and specifications, nor were the floors level. These presented difficulties for the ArtCraft installers. Also, the painters and trim carpenters were still working in the units. ArtCraft service manager, Gill testified that when the cabinets were delivered to the individual units in building 12, the carpenters had some "moulding and stuff laid on the floor, and they were mad because we were in their way". This confusion created hard feelings so that the other artisans moved the cabinets into other apartments out of the way.

The production schedule allowed ArtCraft 10 working days to install the cabinets. Ms. McGauvran sent Allison to the project to resolve the problems. Allison found that Summit superintendent, Richardson, had employed carpenters to hang the cabinets. Apparently, the ArtCraft cabinet installers had been fired. Gill testified that two ArtCraft installers were present on May 11, the delivery date, and two additional installers appeared the next day. When Gill returned to the site three days later, these men had been replaced by two men hired by Jones, the Summit general manager. Jones testified the ArtCraft installers did not know what they were doing. According to Jones, he had been granted authority from Ms. McGauvran to terminate the men and hire the other two. Ms. McGauvran testified she had never instructed Jones to fire any installer working for ArtCraft.

The two installers employed by Jones worked for a short time and then quit, disaffected because the cabinet components were in disarray, scattered throughout the apartments where they had been moved by the other artisans. Allison placed an advertisement in the Kansas City Star for installers; several men responded and three were eventually hired and worked on the project until Summit terminated the ArtCraft contract. [There was testimony from Summit that none of the ArtCraft installers lasted long on the job and no crew worked continuously.]

The most formidable obstacle facing the ArtCraft installers resulted from a drafting error involving a number of the kitchens: the architectural plans did not allow sufficient room for the gas ranges. The result was that the dishwasher door in these kitchens would not fully open and ArtCraft had to redesign 10 cabinets. The cabinets from these kitchens were returned to the Art-Craft plant and reworked while others were replaced by new cabinets. This additional expense was calculated to be $2000.

Jones informed McGauvran by letter of June 10, 1971, that ArtCraft was in default and that if qualified installers were not on the job on June 11, Summit would consider the contract breached. [According to the terms of this letter, Summit had put its own carpenters on the installation of cabinets on June 10.] In response, the ArtCraft attorney wrote Jones on June 17 in which he charged that the use by Summit of their carpenters without a prior 48–hour notice to ArtCraft violated paragraph XVI of the subcontract:

> The subcontractor agrees to proceed with the work according to the schedules laid down by the General Contractor as time is considered to be the essence of the contract. Should the subcontractor fail or refuse to meet these schedules then the contractor after forty-eight (48) hours notice in writing to the subcontractor may take over his work . . . and such cost will be borne by the subcontractor . . . .

The letter also complained of harassment of ArtCraft installers and additional work not required by the contract.

Summit declared the ArtCraft contract breached and terminated in a letter dated June 25, 1971. ArtCraft declared itself ready, willing and able to perform the contract, but acceded to the Summit request that ArtCraft discontinue services. ArtCraft employees left the job site and Summit contracted with Woodstock Manufacturing Corporation for the supply of cabinets at the contract price of $81,500.98.

Summit evidence was that (1) ArtCraft had shipped 71 cabinets before the contract was terminated; (2) Summit paid $16,085.59 to complete installations of these 71 units after ArtCraft was terminated; (3) Summit paid Woodstock $81,500.98 for manufacture and installation of cabinets in the other 209 units and the clubhouse; (4) Summit paid VanTop, the subcontractor for cabinet tops, $5,699.17 and (5) Summit paid $20.70 to one Holcomb, for the balance due on subcontract to him from ArtCraft.

The petition alleged that ArtCraft furnished $23,630.60 in labor and materials for apartment improvements before the contract was terminated. The plaintiff sought an additional $25,000 damages for loss of bargain. The plaintiff contends that Summit breached the contract by assuming to perform for ArtCraft without the prior 48-hour notice required by paragraph XVI of the undertaking, and that in any event, ArtCraft was even then in proper performance of contract.

Summit contended that ArtCraft breached the contract obligation to deliver and install cabinets according to the terms of the agreement. The court entered judgment for ArtCraft for $33,050.56 and denied the Summit counterclaim. The judgment was grounded on admirably drawn and carefully explicit findings of fact and conclusions of law. The damage award was derived on this reckoning:

| | | |
|---|---|---|
| Plaintiff's labor and materials | | $23,630.60 |
| Less credits | | |
| Defendant paid VanTop | $3,593.85 | |
| Defendant paid plaintiff's installers | 569.70 | |
| Defendant paid Holcomb | 20.70 | 4,184.25 |
| | | $19,446.35 |
| | | |
| Interest | 2,644.71 | |
| Damages for reworking cabinets | 2,000.00 | |
| Damages for loss of profit | 8,959.50 | 13,604.21 |
| | | |
| Total Damages | | $33,050.56 |

Summit impugns numerous findings of fact and conclusions of law as speculative and without substantive basis. On the contrary, the proof of each—albeit disputed— was sufficient for the inferences drawn by the court. An appellate court will sustain the decree of issues tried to the court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law". *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976); Rule 73.01.

Summit cites error in conclusion of law number 4 which allowed ArtCraft $2,000 additional damages for reshipment of cabinets to the factory, reworking them, and then redelivery to the project site for installation. This award of damage rested on the substantial evidence that through architectural oversight sufficient space was not allowed for the cabinets according to the original drawings, so that they required remanufacture through no fault of Art-Craft. Summit further contends that such evidence should not have been received because the item of damage had not been specifically pleaded as required by Rule 55.-19. The trial court ruled that such proof was within the intendment of the broad pleading that ArtCraft had expended additional labor because of the actions of Summit which prevented performance according to the contract terms. The ruling was within the holding of *Johnson v. Flex-O-Lite Manufacturing Corporation,* 314 S.W.2d 75, 84[10] (Mo.1958) that " '[a]ll pleadings shall be so construed as to do substantial justice.' The averments of a pleading should be given a liberal construction, according the averments their reasonable and fair intendment."

The ancillary contention that the evidence was not sufficient to prove the Summit breach of contract could have caused the need to rework the cabinets is also without merit. The form of this contention is this claim is actually for extra work to which ArtCraft had no contractual right to damages without compliance with paragraph XIII of the undertaking which disallows claim for extra work done by a subcontractor who proceeds without a written work order from the contractor. The need to rework the cabinets, however, was not extra work within the meaning of paragraph XIII, but additional labor used in the performance of the contract as written and agreed, but hindered by the default of the architect for Summit. This comports with the express finding of the trial court on that issue of fact. We need not restate all the other articulations on this point. It is enough to iterate that there was competent evidence that the need to rework the cabinets resulted from the architectural error which designed the kitchens for gas range rather than standard electric range installation. It cost ArtCraft $2000 to correct the error of the contractor and damages in that sum were justly awarded.

Summit contends next that the award to ArtCraft of $8959.50 damages for loss of profits was error because: (1) the loss was not proved with reasonable certainty; (2) the evidence on this item of damage was received improperly over objection, and (3) the cost of full performance would have

exceeded the contract price and resulted in a net loss to Summit.

The trial court found that Summit had breached the contract by cancellation without cause and allowed ArtCraft the benefit of its bargain. A party injured by the breach of contract is entitled to the value of the performance of the contract. The rule is given in *Boten v. Brecklein,* 452 S.W.2d 86, 93[4–8] (Mo.1970):

> [The injured party] is entitled to the benefit of his bargain, that is, whatever net gain he would have made under the contract.

The proof of damages made by ArtCraft through Love, secretary-treasurer and accountant, employed this standard. It was his testimony that ArtCraft anticipated a ten percent profit from the $89,595.00 to be received from Summit for performance of the contract. See, *Startzell v. Johnson,* 253 S.W. 54, 55[2] (Mo.App.1923). Summit had every reason to expect when the contract was made that a breach such as it afterwards committed would result in the damages for loss of profits claimed by ArtCraft and awarded by the court. See, Corbin on Contracts, § 1012. The award of $8,959.50 on this issue was supported by the evidence and therefore proper.

Summit complains also that this element of special damage was not pleaded and for that reason was erroneously received. The evidence on this issue was received without objection, thus the pleadings are deemed to be conformed to the proof.

The next contention on this aspect of damage is that the estimate of the secretary-treasurer for ArtCraft was totally unreliable for the assessment of loss of profits, but that under the authority of *Tnemec Company v. North Kansas City Development Company,* 290 S.W.2d 169 (Mo. 1956) ArtCraft was not only required to establish the market price of the cabinets at the time of delivery, but also the expenses which lessened the profit. The failure of ArtCraft to reckon the cost of completion of the contract, Summit contends, would have resulted in a net loss to ArtCraft on that element of damage. *Tnemec* holds only that [l.c. 174] the proof of loss of profit must rest on reliable data, that it must be proved to a reasonable certainty. The benefit of the bargain to which ArtCraft was entitled was determined by price established for the cabinets by the contract, not the market. Unquestionably, as *Tnemec* decides, the cost to complete the contract must be credited against the anticipated profit, but that was the precise effect of the testimony by Love that the cost of manufacture and installation of the cabinets deducted from the contract price would result in the ten percent profit margin—$8959.50 [given by Love approximately as $9000]. This point is overruled.

Summit next controverts a number of the findings of fact upon which the judgment rests. Among them, the findings of the court [XXII and XXVIII] that there was no breach by the plaintiff of any material provision of the contract which would justify cancellation by the defendants or support an award of damages to them. We need not replicate the plethora of contractual provisions Summit uses to develop argument on this point. The sense of this contention is that the trial court did not expressly find that the ArtCraft work was done in a skillful and workmanlike manner. Summit cites *Rosen v. Alside, Inc.,* 248 S.W.2d 638, 644[6, 7] (Mo.1952) for the rule that:

> [W]here one seeks the recovery of damages of one who he alleges has violated the terms of a mutual contract, the plaintiff must allege and prove that he has himself performed or offered to perform the terms of the agreement.

The trial court made no finding that ArtCraft worked in a skillful and workmanlike manner, but did award the plaintiff the entire amount of damages sought for labor performed, $1,660.80. The contention of Summit that 90% of the cabinets ArtCraft installed had to be redone because they were glued together rather than anchored by screws was controverted by ArtCraft evidence that there was difficulty in placing the cabinets because of

faulty construction and other hindrances. The parties both argue on the authority of *Brusca v. Gallup,* 429 S.W.2d 780 (Mo.App. 1968). In that case the plaintiff, a carpenter, was awarded a mechanic's lien. The counterclaim asserted that plaintiff had not performed in a satisfactory and workmanlike manner. The court determined [l.c. 782] that all controverted issues of fact are deemed to be found in accordance with the result reached. Rule 73.01(b). In light of the uncontradicted record that the work was deficient, the judgment was reversed. The record before us displays no such deficiency. The evidence on the skillfulness of performance, albeit disputed, allows the inferential finding, consistent with the judgment ultimately entered, that ArtCraft performed in a workmanlike manner.

■ In this case the trial court specifically found that ArtCraft, not in breach of the contract, was hindered in performance of the provision for installation of cabinets by the acts of the defendant, and was entitled to recover. The principle that one who hinders performance by the other party to the contract may not avail by the nonperformance so induced [*Hillis v. Blanchard,* 433 S.W.2d 276, 279[3, 4] (Mo.banc 1968)] supports the findings and judgment.

Summit next specifies ten other findings of fact [which relate to the agreed work schedule for the production and installation of cabinets and which determined the performance of these obligations by ArtCraft was in full compliance with the obligations of the subcontract] were not supported by the evidence.

Summit insists that time was of the essence of the contract and that delay by ArtCraft constituted a breach. And, indeed, paragraph XVI of the contract provided that "[t]he subcontractor agrees to proceed with the work according to schedules laid down by the General Contractor as time is considered the essence of the contract". The formal provision of the contract [paragraph III] which related to the time for performance by ArtCraft, however, remained blank, uncompleted. The

court specifically noted this lapse and found that no agreement was reached by the parties as to the time for completion of the installations by ArtCraft. The court also found that the production, which provided that the installations of cabinets in building 12 was to be completed in ten working days, was not a part of paragraph III and did not complete the space left blank at the time of execution. [This conclusion is supported by the Summit general manager, Jones, who testified that the production schedule was not intended to complete provision III of the contract.]

■ The trial court correctly stated the principle that the law implies a reasonable time to perform where no time limit is fixed by the contract. *Donahoo v. Thompson,* 270 S.W.2d 104, 107[1] (Mo.App.1954). In addition, the court found that the plaintiff was hindered in the performance of the contract provision for the installation of the cabinets by the acts or fault of Summit. The prevention or hindrance of performance of a building contract with a specified time by the contractee ordinarily excuses the delay. *Southwest Engineering Company v. Reorganized School District R–9, Lawrence County, Marionville,* 434 S.W.2d 743, 750[16–18] (Mo.App.1968). One who hinders performance by the other party may not avail himself of nonperformance he induced or occasioned. *Hillis v. Blanchard,* 433 S.W.2d 276, 279[3, 4] (Mo.banc 1968). The principle is fully stated in 17A C.J.S. Contracts § 468:

> [T]here is no breach of a contract on the part of one whose performance is prevented, or rendered impossible, by the conduct of the other party, and the party prevented from performing may be treated, or considered, as though he had performed.

■ ArtCraft sales representative Allison construed the contract and production schedule to allow ten days to fabricate and ten days to install the cabinets. Allison believed that, until the time the contract was cancelled ArtCraft was performing in accordance with the contract and produc-

tion schedule. The trial court agreed with Allison and concluded that ArtCraft had performed within a reasonable time under the circumstances. Where a contract expressly provides that time is of the essence, so that performance on time is made a condition of the obligor's reciprocal rights under the contract, the parties may waive that provision by their conduct. *Fritts v. Cloud Oak Flooring Co.,* 478 S.W.2d 8, 12[2, 3] (Mo.App.1972); 3A Corbin on Contracts, § 754. The court did not find that time was of the essence, but that Summit had abandoned the production schedule and hindered performance by ArtCraft. There is no question that ArtCraft did not perform in a timely fashion according to the dates set out in the original production schedule, but that was because building 12 was not ready for cabinet installation on the date specified. This composite point is without merit.

Summit next contends that the findings of the trial court that ArtCraft did not breach any material provision of the contract is contradicted by the evidence of failure to pay VanTop, Inc. $3593.85 for cabinet tops, the failure to pay $569.70 to carpenters hired by ArtCraft and failure to pay Holcomb the $20.70 owed. Summit cites paragraph II of the contract which obligated ArtCraft to pay for all materials used in the performance of their work on the project, and paragraph XVII which allows cancellation by one party for an act of insolvency of the other. ArtCraft was adjudged bankrupt on April 9, 1974.

The court found [number XXIX] that Summit had paid VanTop, Inc., $3593.85 for a waiver of lien for materials and labor VanTop furnished ArtCraft, and allowed a credit for this amount. Summit contends that the total amount paid by them to Van-Top was $5699.17—a discrepancy explained by $2105.32 paid by Summit about a month after ArtCraft was terminated. [The trial court apparently concluded that this late payment was not on behalf of ArtCraft.]

▮ ArtCraft admits it employed Van-Top to furnish vanity tops. The invoice dates on the bills payable to VanTop were June 24 and 25, but it is possible they were received after ArtCraft received notice of termination. Summit, of course, may not claim the benefit of a contract by insistence that ArtCraft comply with a condition precedent of the agreement Summit was the first to violate. *Boten v. Brecklein,* 452 S.W.2d 86, 92[1, 2] (Mo.1970).

Summit also paid $569.70 to carpenters hired by ArtCraft and later fired. Jones testified for Summit that Ms. McGauvran had asked him to pay these men. ArtCraft did not repay this charge because the amount was in dispute and Summit had failed to make interim payments according to the terms of paragraph XVIII of the contract which required Summit to pay ArtCraft "Ninety (90%) of the value of the work, labor and materials satisfactorily executed in place, monthly . . .". The court found this issue for ArtCraft [number XXV], thus the failure of ArtCraft to pay the artisans was not a breach of the contract.

As to the $20.70 paid by Summit to Holcomb at the request of HUD, the court found that payment was made several months after termination of the contract, and it is apparent that this failure of payment was a negligent lapse not discovered by ArtCraft until after cancellation of the contract.

Summit insists, under this point, that the adjudication on April 9, 1974, that ArtCraft was bankrupt was evidence that the concern was in financial distress during the summer months of 1971, the operative date of the contract, and that this consideration, in conjunction with the failure to pay the three payments to VanTop, the artisans and Holcomb, was sufficient cause to justify the termination of contract. This conclusion presupposes facts in contradiction to the determinations actually made by the court and supported by the evidence. This aggregate point is denied.

▮ Summit next complains the court erred in denial of its counterclaim for the cost of correction of deficiencies in the work

performed by ArtCraft. The evidence already recounted supports the finding that ArtCraft was hindered by Summit from performance of the contract, and thus the conclusion of law that Summit was not entitled to recover on the counterclaim was validly based on the evidence.

■ The final point contends that the calculation of interest entered by the court was erroneous. The court allowed interest from July 18, 1971, to October 24, 1973, on $19,446.35, the net cost of labor and material incurred by ArtCraft in the performance of the contract [after credits to Summit for payments to VanTop, some carpenters and Holcomb]. Summit contends interest is allowable from the date of demand and that there was no evidence ArtCraft demanded payment on July 18. The answer pleaded by Summit admits the allegation of the ArtCraft petition that demand for payment was made on July 18, 1971. Also, there was evidence that the last invoice sent to Summit was dated June 18, 1971, and that payment was demanded within 30 days of presentment. As previously shown, paragraph XVIII of the contract provided for payment of 90% of the value of the work, labor and materials satisfactorily executed in place. There was evidence that Summit delayed compliance with that provision. The calculation of interest was based upon the provisions of § 408.020, RSMo 1969 and was validly entered.

The judgment is affirmed.

All concur.