**In re the Marriage of: Jeneffer Keet BELL, Petitioner–Appellant/Respondent,**

v.

**Mark Robert BELL, Respondent–Respondent/Cross–Appellant.**

**Nos. SD 30208, 30222.**

Missouri Court of Appeals, Southern District, Division Two.

March 31, 2011.

Motion for Rehearing or Transfer Denied April 22, 2011.

Application for Transfer Denied June 28, 2011.

John D. Compton, Springfield, MO, for Appellant/Respondent.

Harold F. Glass, Springfield, MO, for Respondent/Cross–Appellant.

Before RAHMEYER, P.J., BATES J., and FRANCIS, J.

PER CURIAM.

Mark Robert Bell and Jeneffer Keet Bell[1] were married on August 7, 1999. A final judgment of dissolution was entered on November 16, 2009; both parties appeal from that judgment.[2] All of Jeneffer's points are connected to her complaint that Mark is an actual owner of various accounts and real estate and, thus, the trial court erred in allocating certain accounts and real estate as nonmarital property. Mark, on the other hand, complains that the trial court erred in disallowing him credit for social security disability payments, which Mark's father collected for the benefit of the parties' minor child, and for awarding $20,000 in attorney fees to Jeneffer. It is a serious understatement to say that the trial court was subjected to confusing, conflicting evidence that indicated that the disputed real estate was a ball in a shell game.[3] We will set forth the facts as well as we can given the state of

---

1. We refer to the parties, at times, by their first names for purposes of clarity. No disrespect is intended.

2. Mark Bell and Jimmie Bell were also added as "joined parties and additional Separate Respondents," in the following capacities: Mark Robert Bell, Trustee of the First Bell Trust Dated 1 January 1997; Jimmie Bell, Trustee of the First Bell Trust Dated 1 January 1997; Mark Robert Bell, Trustee of the Second Bell Trust Dated 1 January 1997; and Jimmie Bell, Trustee of the Second Bell Trust Dated 1 January 1997. A third trust was also established on January 1, 1997. The trustee

of the Third Bell Trust Dated 1 January 1997 was not added as a party.

3. A shell game is one of the oldest and most popular of the tricks traditionally performed by a conjurer.

> To begin the trick, the performer places a bead or ball (often a pea) under one of three inverted cups (or half-shells). As the cups are rearranged on a flat surface, the ball is made to "jump" invisibly from one cup to another, or to "multiply." The basis for the illusion is a secret additional ball that, by skilled manipulation, is put under one cup while the known ball is removed as

available information provided by Mark and Jimmie Bell to the trial court.

### Facts

As noted, the parties were married in 1999; at that time, Mark worked full time for his father, Jimmie Bell, at Jimmie's land title company as a salaried employee. Jimmie testified that the last year Mark "had any pay from the title company was '02." After that, Mark began working with his father buying, renting, and selling real estate. Mark was his own boss, choosing his hours and what work needed to be done. Mark searched for property to be bought, ran comparable sales, and had other general duties to employ carpenters, plumbers, etc., to work on the houses. Jimmie handled all of the accounting and other business aspects. Jimmie said in his deposition: "that if it was on a share-type basis and made money, why he [Mark] shared in the money that I made. And if I didn't make any money, he didn't get any money." Mark was not paid a salary. In fact, when Jimmie was asked how he compensated Mark and made sure Mark had money to live once he was no longer on the title company's payroll, Jimmie answered, "I gave it to him." Jimmie further testified that he paid Mark in the neighborhood of $100,000 to $150,000 per year throughout the marriage. The arrangement demonstrated many of the hallmarks of a partnership. The trial court found that Mark worked with his father in the purchase and sale of real estate; however, it further found "the evidence does not support [Jeneffer's] contention that Jimmie Bell and Mark Bell were partners doing business in the name of one or more of the trusts."

In 1997, three trusts were created by the Bells. First Bell Trust indicates that the grantor was Mark Bell, the trustee was Mark Bell, and the alternate trustee and beneficiary was Jimmie Bell. Second Bell Trust indicates that the grantor and trustee was Jimmie Bell, with Mark Bell being the alternate trustee and beneficiary. Third Bell Trust indicates that both Jimmie and Mark Bell were the grantors and trustees, with no alternate trustee and the survivor being Marilyn Bell, the beneficiary upon death of the grantors. The purpose of First Bell Trust, according to Jimmie Bell, was to hold real estate as collateral in order to obtain financing from Systematic Savings beyond maximum lending limits. Jimmie Bell asked his good friend at Systematic Savings, Charles Goddess, about circumventing the maximum lending limits:

> is there some way around this or can you broker it and find me money elsewhere and he said no, but if Mark had a trust or individually or whatever, that I could transfer property to Mark that he could then borrow the maximum. So I transferred enough property to First Bell Trust for Mark to pledge to get the maximum loan again and Mark had to sign the documents as trustee of First Bell Trust and personally guarantee the note—the notes have personal guarantee on them. Then the property was transferred back to Second Bell Trust with the exception of four that for whatever reason did not get on the first deed.

To obtain the loans, Jimmie prepared financial statements for the bank that listed Mark as a one hundred percent owner of certain properties and a fifty percent owner of others.[4] At trial, Jimmie was ques-

---

secretly from another cup. The manipulative work is aided by the distracting conversation, or patter, of the conjurer.

Encyclopedia Britannica, http://www.britannica.com/EBchecked/topic/539702/shell-game (last visited Mar. 16, 2011).

4.  We quote extensively from the testimony of

tioned about the tax returns and financial statements as follows:

[Jeneffer's Attorney]: Now, these income tax returns are provided to the banks who have leant [sic] you the money to buy these properties; is that correct?

[Jimmie]: That is correct.

[Jeneffer's Attorney]: And you prepare both the income tax returns and the financial statements for Mark Bell to provide the banks to substantiate these loans, don't they—don't you?

[Jimmie]: Yes, sir.

[Jeneffer's Attorney]: Okay. And the banks require, under banking law, true and accurate financial statements don't they?

[Jimmie]: I would think they would want true and accurate.

[Jeneffer's Attorney]: Okay. And you've provided these financial statements that have been previously introduced into evidence as true and accurate financial statements showing ownership of Mark having in property and you having in property?

[Jimmie]: The requirements of the lenders were that the financial statements match the tax return.

[Jeneffer's Attorney]: Are you telling me that it was not a requirement of the banks to have true and accurate financial statements submitted to them?

[Jimmie]: I did not say that. I told you that the banks required that the financial statements match the tax returns.

[Jeneffer's Attorney]: And don't they require true and accurate tax returns?

[Jimmie]: They require a copy of what was filed with Internal Revenue.

[Jeneffer's Attorney]: And are you aware that there are federal banking laws on banking fraud if you submit false documentation to substantiate and maintain loans?

[Jimmie]: I would think so.

[Jeneffer's Attorney]: Okay. So are the—are not the financial statements that you've submitted true and accurate?

[Jimmie]: The financial statements I had submitted were done to match the tax returns that were filed.

[Jeneffer's Attorney]: My question is this: Are they or are they not true and accurate?

[Jimmie]: They match the tax returns.

[Jeneffer's Attorney]: Believe that's a real simple yes or no answer. Do I need to ask the Court to direct you to answer my question?

[Jimmie]: The—the financial statements were done based upon what the lenders required.

[Jeneffer's Attorney]: Let me just ask you this. I'm going to hand you Mark Bell's financial statement, which has been introduced as Exhibit H, for the year ending 31 December '07. Is that a true and accurate statement?

[Jimmie]: It appears to be.

[Jeneffer's Attorney]: Okay. And that was prepared by you—

[Jimmie]: That is—

[Jeneffer's Attorney]:—correct?

[Jimmie]: That is correct.

Additionally, Mark listed the same properties as his assets on his income tax returns. Mark testified that he had seen the

Jimmie because there was no other testimony from Mark regarding the ownership of the real estate.

returns, but never examined them; he further claimed that Jimmie did all the preparation work on them, and that he (Mark) just signed them. Jimmie also testified that Mark played no role whatsoever in preparing the returns; Jimmie prepared the tax returns and listed ownership of the properties that way. If the properties had not been listed on Mark's return they would have been on Jimmie's. Jimmie further explained that listing some of the properties at one hundred percent and others at fifty percent on Mark's returns "was a misnomer of ownership on the tax return which was referring strictly to the profit that [Jimmie] had intended to divide with Mark or give to Mark. Ownership per se was as to income expenses not titled to the real estate. It was not a—an abstract or a title policy, it was a tax return." [5]

Jimmie also stated that when preparing the tax returns he "attempted to allocate enough income and expense from various properties being all of it on some and half of it on some to approximate the money that I was giving [Mark] so that his tax return actually reflected in the general range of what I was giving him, even though it was not W–2 or 1099 money." At the time of the dissolution, Mark listed debts totaling $1,627,178.07, including a debt to Systematic Savings in the amount of $664,773.75 on certain properties; $248,900 to People's Bank; $437,000 to Old Missouri Bank; $136,475.96 to Marilyn Bell; $3,400 to Harley Davidson Mtr. Credit; $1,499 to Cox Medical Center; $2,400 to Empire Bank; $8,800 to Capital One Bank; $24,835.36 to Discover Card; $19,000 to First Equity Card; $13,587 to U.S. Bank Card; $15,000 to Bank of America; $11,542 to HSBC Card; $1,965

to GE Money Bank; $10,000 to Advanta Bank; $25,000 to Chase Bank; and $3,000 to American Express. The court assigned those debts and the debts on the 89 parcels of real estate in dispute to Mark.

The trial court found: "After the marriage, [Jeneffer] signed nine 'Assent to Execution of Instruments and Waiver of Interest' forms and two quit claim deeds with respect to various parcels of real estate that were owned by Bell trusts. The nine assent forms recited that the properties were separate property and not marital property." Jeneffer Bell signed what was called a "waiver" to more than forty real estate properties. The nine waivers stated that Jeneffer "expressly assent[ed] to any conveyance of real estate made by [her] spouse, Mark Bell, and to the execution of any mortgage or deeds of trust or other instruments by [her] said spouse, Mark Bell, and acknowledge[d] and state[d] that any such conveyances, mortgages, or deeds of trust, are not deemed to be in fraud of [her] marital rights." The purpose of the waivers was so that Mark "may execute and deliver conveyances and mortgages or deeds of trust without [her] joinder therein or without [her] express assent to each particular conveyance or mortgage or deed of trust endorsed thereon[.]" In addition, the waivers declared that the real property referenced "shall be considered [Mark's] own separate property and shall not be considered in any way as marital property. It is further agreed and understood that [Jeneffer] does hereby waive any and all claims of interest now present or arising in the future concerning said separate property."

Jeneffer testified that "Mark asked if [she] would come sign some documents so

---

**5.** The 2007 instructions for Schedule E of form 1040 include this statement: "If you own a part interest in a rental real estate property, report only your part of the income and expenses on Schedule E." http://www.irs.gov/pub/irs–prior/i1040se-2007.pdf (last visited on Mar. 9, 2011).

that [she] wouldn't have to come down every time he bought or sold a house." Mark did not discuss any interest Jeneffer might have in the houses before she signed the waivers, "[h]e just said he needed [her] to sign them so that he could buy them and sell them without [her] having to be part of the business with him." Jeneffer did not question Mark about signing the waivers and was not given any consideration for doing so. Jeneffer "just knew that Mark told [her] to sign them and that's what [she] did. [Mark] said signing [the waivers] would save [her] coming and signing every time [Mark] needed to conduct business and [she] had no reason to doubt him."

Jimmie and Mark Bell produced Exhibit 49, and Jimmie testified that the second column in that exhibit represented the present fair market values of the real estate as copied from Exhibit AA, which was prepared by Jeneffer's attorney;[6] however, Jimmie and Mark also claimed on Exhibit 49 that at least fifty-seven of the real estate parcels were worth less than the debt against them. The following exchange occurred at trial when Jimmie was asked to explain the discrepancy in the values:

> [Jeneffer's Counsel]: Okay. And isn't it noted in your financial statement that those are very conservative values and that's usually 80 percent of what was paid for the property?
>
> [Jimmie]: Those are very conservative values. I don't know that they're 80 percent of what I paid for the property.
>
> [Jeneffer's Counsel]: The value of these properties in actuality would be greater than what's reflected in the second column; isn't that correct?

[Jimmie]: Most likely—today's real estate market is somewhat unpredictable.

> [Jeneffer's Counsel]: The value is greater than what's reflected in the second column; wouldn't you agree, sir?
>
> [Jimmie]: Most likely.
>
> [Jeneffer's Counsel]: Okay. Is that say [sic] you don't know or you do know?
>
> [Jimmie]: Neither one.
>
> [Jeneffer's Counsel]: You neither know or you don't know?
>
> [Jimmie]: Mr. Compton, I have not run comp sales on any of them.
>
> [Jeneffer's Counsel]: In that case you do not know then, correct, sir?
>
> [Jimmie]: Okay. All right.
>
> [Jeneffer's Counsel]: Okay. There's indications here that there is more owed against it than what the value shown. How do you explain that?
>
> . . . .
>
> [Jimmie]: Mr. Compton, I did not enter the figures in the first column. Those were copied from your Exhibit AA.
>
> . . . .
>
> [Jeneffer's Counsel]: Okay. So the values in the second column need to be adjusted upward, don't they?
>
> [Jimmie]: Mr. Compton, I didn't really pay any attention to them. I took them from your Exhibit AA.

### Schwab IRA

Contrary to the apparent lack of business success in the value of the rental properties, a Schwab IRA in Mark's name had astronomical success. At the time of the marriage, the Schwab account had approximately $20,000 in it. Near the time of trial, the account was worth approximately $206,900.16. Mark produced elev-

---

**6.** Counsel explained that the values used to create Exhibit AA were taken from the values listed in the income tax returns prepared by Jimmie.

en statements of the account's value for periods beginning in 1999 and ending in 2009. There was no testimony regarding any additional deposits made to the IRA. The trial court found Mark's interest in the Schwab account in the amount of $195,980.90 to be Mark's nonmarital property.[7]

Mark is currently on social security disability[8] income; however, at the time of the trial, he admitted that his phone number is used for contact in the rental business and he still had real estate signs in his vehicle. As part of Mark's disability benefits, the minor child of the parties was awarded social security benefits. Despite the fact that Jeneffer had custody of the minor child during the pendency of the dissolution, the social security benefits were paid to Jimmie Bell. Mark's mother also paid a regular allowance to her grandchild in the amount of $25 per week. The trial court awarded Jeneffer $8,738 in retroactive support,[9] but did not give Mark credit for the social security funds; it also ordered Mark to pay $20,000 in attorney fees to Jeneffer.

## Standard of Review

■ In general, the standard of review in a dissolution of marriage case is the same as that used for any other court-tried case; the trial court's judgment will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or misapplies or erroneously declares the law.

*In re Marriage of Wood,* 262 S.W.3d 267, 270 (Mo.App. S.D.2008) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)).

■ This Court's standard of review of the trial court's division of property is as follows:

A trial court "is vested with great flexibility in its division of marital property," and its division "need not be equal but must be fair and equitable given the circumstances of the case." *Dowell v. Dowell,* 203 S.W.3d 271, 276 (Mo.App. W.D.2006) (internal citation omitted). In reviewing a trial court's ruling on a division of property, we presume it is correct, and the party who challenges the division has the burden of overcoming that presumption. *Id.* An appellate court will interfere only where the division is so unduly favorable to one party that it constitutes an abuse of discretion. *Poole v. Poole,* 977 S.W.2d 940, 944 (Mo. App. S.D.1998). The fact that one party is awarded a higher percentage of marital property is not itself an abuse of discretion. *Dowell,* 203 S.W.3d at 276.

*Neal v. Neal,* 281 S.W.3d 330, 341–42 (Mo. App. E.D.2009). "Section 452.340.1 [RSMo Cum.Supp.2007] permits the trial court to award retroactive child support to

7. Schedule V sets forth the division of marital and nonmarital property. Both parties received a marital property division of interest in the Schwab IRA account in the amount of one-half of $10,919.26, or $5,459.63 each. The remaining balance of $195,980.90 was awarded to Mark as nonmarital property.

8. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2006).

9. The court awarded retroactive child support to Jeneffer in the amount of $17,238, for the time period of December 1, 2006, to September 2009, but reduced the principal sum by the $8,500 paid by Jimmie Bell during the same period of time stating that it had clearly been paid for the benefit of the minor child in recognition of Mark's financial obligation.

the date of the filing of the petition." *Shelton v. Shelton*, 29 S.W.3d 400, 405 (Mo.App. E.D.2000). The trial court has discretion to award retroactive child support. *Id.* "Further, a party is entitled to receive credit against the retroactive award of temporary support for voluntary amounts paid to the child between the time of separation and the time of trial." *Id.*

### Jeneffer's Points Relied On

■ We first address Jeneffer's last point, which claims that the trial court erred in finding that Jeneffer waived an interest in parcels of real property by signing documents entitled waivers. The waivers purport to declare the property described in each waiver as Mark's separate property. In order to find that the documents Jeneffer signed were waivers to any claim to the properties and that the properties were Mark's separate property, there must have been a valid postnuptial agreement.

■ A postnuptial agreement is "[a]n agreement entered into during marriage to define each spouse's property rights in the event of death or divorce." Black's Law Dictionary 1286 (9th ed.2009). In determining whether a postnuptial agreement is valid, we apply the same rules used to determine if an antenuptial agreement is valid. *Lipic v. Lipic*, 103 S.W.3d 144, 149–50 (Mo.App. E.D.2003). A postnuptial agreement will not be enforced unless entered into " 'freely, fairly, knowingly, understandingly and in good faith with full disclosure.' " *Id.* at 149 (quoting *McMullin v. McMullin*, 926 S.W.2d 108, 110 (Mo.App. E.D.1996)). This requirement relates to the circumstances surrounding inducement of the waiving party's signature on the agreement. *See J.A.D. v. F.J.D.*, 978 S.W.2d 336, 340 (Mo. banc 1998) (In discussing the validity of an antenuptial agreement, the

court cited factors including the waiving spouse's access to independent counsel and understanding of the agreement, disclosure of the assets and their values, disclosure of the spouse's legal rights, and the relative equality of the bargaining positions between each spouse in terms of age, sophistication, education, employment and experience.).

■ The agreement must also be conscionable. *Ferry v. Ferry*, 586 S.W.2d 782, 786–87 (Mo.App. W.D.1979). To determine whether an agreement is conscionable, we look to the fairness of the agreement's actual terms. An agreement "is unconscionable when 'the inequality [is] so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it.' " *Lipic*, 103 S.W.3d at 149–50 (quoting *McMullin*, 926 S.W.2d at 110). Also, the waiving spouse must receive fair consideration to waive that spouse's statutory rights; fairness is determined as of the date the parties enter into the agreement. *Hosmer v. Hosmer*, 611 S.W.2d 32, 35 (Mo.App. S.D.1980).

There was no evidence that there was any disclosure of what Jeneffer's legal rights were to any of the properties that were listed in Mark's name, nor how those legal rights would be affected by signing the waivers. Although the waivers listed certain properties, there was no evidence that Jeneffer had access to independent counsel or that she had an equal bargaining position with Mark. According to the testimony, the waivers were executed at Jimmie's insistence, but there was no discussion with Jeneffer regarding her marital rights. Furthermore, there was no evidence that Jeneffer received any consideration to waive her statutory rights. If the court found a valid postnuptial agree-

ment, substantial evidence does not support that finding.[10]

We next must determine whether the real estate that was shown as listed on the tax returns and the financial statements are properties that were acquired during the marriage. All of the disputed real estate came into Mark's name after the marriage. It was Jimmie and Mark's argument that the properties were never Mark's properties, even though Jimmie purchased and titled the properties in both of their names jointly, and, thus, were never acquired during the marriage. They contend that Mark was simply an employee, albeit one without W–2's or a set wage, but not a partner in the real estate business.

◼ Jeneffer's first two points find fault with the trial court determination that Jimmie Bell and Mark Bell were not partners doing business in the name of one or more trusts. Jeneffer contends that the purchase of the real estate was the result of Mark's full-time job working with his father, who used Mark's credit to purchase additional properties and that Mark incurred the indebtedness on those properties. We find merit to Jeneffer's claims.

We start with the proposition that all property acquired by either spouse subsequent to the marriage is presumed to be marital property regardless of how title is held, and a spouse who claims such property to be nonmarital must assume the burden of rebutting the presumption by clear and convincing evidence. Section 452.330.3;[11] *Hall v. Hall,* 804 S.W.2d 411,

414 (Mo.App. W.D.1991). There were 89 properties that Mark held a full or partial interest in. The exceptions to the designation of property as marital property include if the property has been acquired by gift, bequest, devise, or descent, or excluded by valid written agreement of the parties.[12] Section 452.330.2. There can be, and was, no contention that the property was acquired by bequest, devise, or descent. Furthermore, Jimmie Bell does not contend that he gifted the properties to Mark Bell. Rather, he contends that the division of interest in the properties was simply a "misnomer."[13]

It is a "misnomer" that has legal consequences. The titling of the properties in Mark's name was meant to have legal consequences. Jimmie and Mark titled certain property in Mark's name in order to obtain at least $679,673.67 in financing from a bank. The financial statements that were presented to the bank were intended to have legal consequences. The income tax returns which claimed that Mark was the owner of the properties were done with the purpose of having legal consequences. We cannot ignore all of those representations that Mark acquired the properties subsequent to the marriage and now state that the properties were not acquired during the marriage due to a "misnomer." The representations by Jimmie and Mark Bell make no sense unless it was to hide the true character of the properties to the bank, to the IRS, and to Jeneffer. It puts this Court in a position of finding a fact contrary to the represen-

---

**10.** It is not entirely clear that the court found that a valid postnuptial agreement existed in the waivers but the finding of fact on that issue indicates that it was a consideration in the award of the property as Mark's separate property.

**11.** All references to statutes are to RSMo 2000, unless otherwise specified.

**12.** There was not substantial evidence to find exclusion of properties due to valid written agreements.

**13.** A "misnomer" is not a recognized exception to the presumption that property acquired after the marriage is marital property.

tation of facts to the IRS and the financial institutions. This we cannot do. We must hold that the representations were true, that Mark owned the properties. Thus, the real estate was property acquired after the marriage.

■ The testimony of every single witness indicates that Mark and Jimmie were engaged in some manner of a common business, the purchase and sale of real estate. "A partnership is an association of two or more persons to carry on as co-owners in a business for profit." *Price v. Vattes*, 161 S.W.3d 397, 399 (Mo.App. S.D. 2005) (citing section 358.060.1). The rules used in determining the existence of a partnership are found in section 358.070, which provides, in pertinent part:

(1) Except as provided by section 358.160 persons who are not partners as to each other are not partners as to third persons;

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property;

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived;

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(a) As a debt by installments or otherwise;

(b) As wages of an employee or rent to a landlord[.]

Section 358.070. Mark and Jimmie represented to the bank and to the federal government that they co-owned properties, which further implies that they were partners in the real estate business.

Mark controlled his own hours, he borrowed money on the properties individually or through First Bell Trust, and the properties were held out as being owned in his name, either in full or in part. There are no indicators that Mark was simply an employee. Jimmie testified (1) that he paid Mark approximately what the title company had been paying him in order to give Mark a comparable amount of money even though Mark was no longer an employee, (2) that he would see that Mark had enough money to live on and that on at least some of the houses Jimmie would share a portion of what he made, (3) that if Jimmie did not make any money, Mark did not get any money, and yet (4) the amount Jimmie gave Mark had nothing whatsoever to do with the success of any particular piece of real estate. Also, Mark did not receive W–2's, and he did not receive a basic salary. Keeping in mind that Mark now collects work-related disability, the money he received from Jimmie was related to their real estate dealings.

The property was acquired after the marriage and is presumed to be marital property. It was Mark's burden to rebut the presumption that it was marital property by clear and convincing evidence. Even keeping in mind our standard of review, that we review the evidence in the light most favorable to the judgment, we are presented with the contradictory testimony of Jimmie as to the ownership of the real estate. His testimony does not come close to rebutting the presumption. There is merit to Jeneffer's first two points. The trial court erred in designating the real estate owned by Mark as Mark's separate property.

■ Likewise, the trial court erred in designating $195,980.90 in the Schwab account as Mark's separate property. Although there was approximately $20,000 in the account at the time of the marriage, a review of the documents produced by Mark indicates that the account most likely did not increase in value to the amount of $206,900.16 without additional contributions; however, the statements provided are not detailed enough to provide confirmation one way or another.

At trial, both parties introduced exhibits reflecting the value of Mark's retirement accounts. Jeneffer introduced as Exhibit D two statements reflecting the value of a Schwab IRA, one from the period ending June 30, 1999, showing a total account value of $20,333.46, and the other from sometime in 2008 showing the total account value of $174,877.90, and one State Bank of Southwest Missouri Statement from December 1996, valued at $2,505.94.

At trial, Jimmie and Mark Bell produced Exhibit 29. Exhibit 29 consisted of three pages of summaries of the three IRAs, one State Bank IRA and two Schwab IRAs, one of which was rolled into the other. Exhibit 29 purportedly showed the values of the IRAs at certain points in time. According to the exhibit, the State Bank IRA was opened in 1992, when the only contribution to it was made. The value of the State Bank IRA as of August 1, 1999 was, according to the exhibit, $2,754.12, and the estimated value at the time of trial was $3,850. The Schwab statements summarize a simple IRA opened in 1998, valued at $16,934.79 in August of 1999, a contribution of $6,720 at the end of 1999, and that this simple IRA was rolled over to Mark's other Schwab IRA in 2002, which was opened in 1995, according to Exhibit 29. The ending value was $206.900.16.[14] The summary of Mark's Schwab IRA, as shown in Exhibit 29, contained legal conclusions of the allocation of its funds as marital or nonmarital. The summary allocated the $206,900.16 this way: $195,980.90 as nonmarital and $10,919.26 as marital.

After trial, Mark produced statements of the Schwab accounts, Exhibit 29–A, that apparently were relied on by the trial court in making its determination.[15] In dividing the Schwab IRA account, the trial court accepted the summary's conclusions of what portion was marital and what portion was nonmarital, allocating $195,980.90 as Mark's separate property, and awarding Jeneffer and Mark half of the remaining $10,919.26. A careful examination of the statements produced after trial as Exhibit 29–A makes it clear to us that those documents did not provide enough information for a fact-finder to determine what proportions of the increase in value of the account

14. Included in Mark's IRA were City Bancorp shares. City Bancorp's shares were private shares, not traded on a public exchange. Their valuation, therefore, was not clear until the shares were sold in 2007; their value was not included in the total investments value listed on the Schwab account statements. Furthermore, we do not have information about whether the increase in the number of shares was due to splits or other separate transactions. We also do not have enough information to determine whether the increase in the portfolio was due to the increased value of securities or additional contributions or a combination of both.

15. Throughout the trial, Jeneffer's counsel complained that documents were not provided during discovery. The statements of the Schwab accounts were never subjected to cross-examination. Exhibit 29–A was apparently received by the trial court at some point after trial. The record does not indicate that Jeneffer had an opportunity to object to its apparent admission. Regardless, as discussed, the statements add opaqueness to the issue of whether and what proportions of the funds in the IRA accounts were marital, which should be addressed on remand.

were marital or nonmarital. Money contributions had to be made to the account during the marriage.[16] If so, those contributions were marital property unless rebutted by clear and convincing evidence. There is no indication in the record of how such accounts increased so significantly in value without any additional contribution.

An individual retirement account, or IRA, is defined as "a retirement savings account in which income taxes on certain deposits and on all gains are deferred until withdrawals are made." *IRA Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/ira (last visited Feb. 24, 2011). According to the IRS, compensation for purposes of funding an IRA includes wages, salaries, commissions, self-employment income, alimony and separate maintenance, and nontaxable combat pay; however, compensation does not include earnings and profits from property, interest and dividend income, pension or annuity income, deferred compensation, income from certain partnerships, or any amounts one excludes from income.[17] Any additions to an IRA then had to be the result of Mark's employment during the marriage. The trial court erred in designating $195.980.90 of the Schwab account as nonmarital property.

■ Likewise, Jeneffer contends that certain undisclosed passbook savings accounts in the amount of $180,118.13 were marital property. As stated earlier, property acquired during the marriage is presumed to be marital property. Other than Exhibit PP–3 being admitted and Jeneffer's testimony that she was asking the court to award her one-half of the accounts, there was no testimony regarding the accounts; however, the trial court found that "[t]he Systematic Savings and Loan passbook accounts were used for the Jimmie Bell real estate business." The passbook accounts do not involve any of the representations to third parties that Mark was an owner. There was simply no evidence before the trial court as to the reason for Mark's name being on the passbook accounts. The accounts were created after the marriage and are presumed to be marital property. Because we must remand to the trial court for a determination on the real estate and the Schwab account, we also remand for the consideration of the passbook accounts for further evidence at the trial court's discretion. Jeneffer's first three points are granted.

### Mark's Points Relied On

■ Mark complains that he was not credited for the social security disability payments that Jimmie received during the pendency of this action. The trial court did not credit these funds against the retroactive child support award, reasoning that "[i]f the respondent Mark Robert Bell had taken appropriate action to designate the petitioner mother, who has throughout these proceedings been the physical custodian of the child, as the payee for the child regarding said social security disability benefits, then those sums having been paid on a monthly basis would have been credited by this court to any retroactive application of child support."

Section 452.340, in part, reads:

1. In a proceeding for dissolution of marriage, legal separation or child support, the court may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable or necessary for the support of the child, including an award *retroactive* to the date of filing the petition,

---

16. For instance, in 2007, the money market account jumped from $14,768.98 in 2006 to $64,265.79, and the investments account jumped from $47,428.90 to $150,101.72.

17. *See* IRS publication 590, http://www.irs.gov/publications/p590/ch01.
html# en_US_publink10006070 (last visited on Feb. 24, 2011).

without regard to marital misconduct, after considering all relevant factors including:

(1) The financial needs and resources of the child;

(2) The financial resources and needs of the parents;

(3) The standard of living the child would have enjoyed had the marriage not been dissolved;

(4) The physical and emotional condition of the child, and the child's educational needs;

(5) The child's physical and legal custody arrangements, including the amount of time the child spends with each parent and the reasonable expenses associated with the custody or visitation arrangements; and

(6) The reasonable work-related child care expenses of each parent.

. . . .

10. ... The amount of child support resulting from the application of the guidelines shall be applied *retroactively* for a period prior to the establishment of a support order and the length of the period of *retroactivity* shall be left to the discretion of the court or director. . . .

Section 452.340 (emphasis added).

■■■■ "It is the trial court's function to balance the equities in determining if a party is entitled to retroactive child support[.]" *Slattery v. Slattery,* 185 S.W.3d 692, 697 (Mo.App. E.D.2006). The trial court, in a dissolution action, has considerable discretion in making child support awards retroactive, and its judgment will not be reversed absent an abuse of discretion. *Homfeld v. Homfeld,* 954 S.W.2d 617, 623 (Mo.App. W.D.1997). Retroactive child support does not have to be specifically prayed for in the petition, but the award must be consistent with the substantive allegations of the petition, requested on the record, and supported by the evidence. *In re Marriage of Gerhard,* 985 S.W.2d 927, 935 (Mo.App. S.D.1999).

The trial court noted that Jimmie Bell did not have custody of the child and yet sought and received social security disability benefits. Those benefits were not paid to the actual custodian of the child. In fact, the custodian of the child was not even informed of the benefits. In a balance of the equities, the trial court did not abuse its discretion in refusing to give credit to Mark for the social security disability benefits.

■■■■ Mark next complains that the trial court erred in awarding attorney fees to Jeneffer in the amount of $20,000. The trial court is authorized to award attorney fees in a dissolution proceeding after considering all relevant factors. Section 452.355.1. This Court's standard of review was set forth in *Hihn v. Hihn,* 237 S.W.3d 607 (Mo.App. E.D.2007):

"The trial court has broad discretion to award attorney's fees in a dissolution proceeding, and an award of attorney's fees is presumed to be correct on appeal. We will only reverse an award of attorney's fees upon a showing of abuse of discretion. To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Goins v. Goins,* 224 S.W.3d 69, 72 (Mo.App. E.D. 2007) (citing *Abbott v. Perez,* 140 S.W.3d 283, 296 (Mo.App. E.D.2004)). . . . An award of attorney's fees will be affirmed on appeal unless unsupported by substantial evidence or against the weight of the evidence. *In re Marriage of Crow,* 103 S.W.3d 778, 783 (Mo. banc 2003) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)).

*Id.* at 609.

There is no abuse of discretion in a complex case where there were thousands

of dollars of attorney fees incurred in discovery, the award of attorney fees was partial, and some of the assets were apparently not disclosed. It is clear from the trial that Mark was not forthcoming in his response to discovery questions. As we indicated, Mark's actions during discovery have every appearance of playing the game "hide the ball." [18] The trial court did not err in awarding partial attorney fees to Jeneffer in trying to uncover marital assets.

The judgment is reversed and remanded. On remand, the trial court may allow such additional discovery or enter such orders as necessary to ensure that it receives complete and accurate facts.[19]

18. Mark's 2007 end of year personal financial statement listed his personal equity in real estate as $1,179,800. That figure, Mark attested, was "based upon extremely conservative values" and was "accurate to the best of [Mark's] knowledge and belief." In the divorce proceeding, he claimed his real estate is worth less than the amount owed and the trial court agreed. The trial court had incomplete information on the values of the property to come to that conclusion. On his personal financial statements, Mark indicated total value, and total liens for half owned properties as half owned in the real estate summary. This contradicts information he provided in his property schedules. For example, in his 2007 personal financial statement, he lists 829 West Battlefield as valued at $312,000 with a lien of $312,000. His interest, according to the financial statement, is half that with a value of $156,000 and lien of $156,000. In his supplemented property schedule, Mark lists his interest in 829 West Battlefield as being valued at $76,020.66 with the full lien amount $312,000. Jimmie testified that he copied the values of the properties in his and Mark's Exhibit 49, a supplemental exhibit listing the values of the real property, mortgage amounts on the property, and mortgage lender, from Jeneffer's Exhibit AA. Jeneffer's counsel explained that the values used to create Exhibit AA were taken from the values listed in the income tax returns prepared by Jimmie. The court used those values in determining the properties were underwater. Unless Mark entered into a separate agreement to take over the full liability of the mortgage, it appears that not only did Mark fraudulently decrease the value/price of his interest in the property so as to make the real property debt exceed its value, according to information he provided to the court, he also fraudulently claimed he was liable for the full mortgage.

19. We cannot help but note the dilemma of the trial court in this complicated, tangled dissolution of assets. When Appellant's counsel objected to the receipt of evidence that was not provided during the discovery process, the court noted, "I'm required to divide all the debts of the parties and I mean, if I keep it out, then we just get it sent back from the court of appeals because there's a debt that I'm not dividing." On remand, the trial court may consider, as an aid to the court, the appointment of a special master pursuant to Rule 68.01 to ensure compliance with the discovery process.