**MATT MILLER COMPANY, INC.,**
Plaintiff–Appellant,

v.

**TAYLOR–MARTIN HOLDINGS, LLC,**
Defendant–Respondent.

No. SD 31478.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 25, 2012.

Rick J. Muenks, Springfield, MO, for Appellant.

Richard L. Rollings, Jr., Camdenton, MO, for Respondent.

DON E. BURRELL, J.

Matt Miller Company, Inc. ("Contractor") appeals a judgment awarding net damages in the amount of $228,138.72 to Taylor–Martin Holdings, LLC ("Owner") after a bench trial. The lawsuit arose out of a construction contract (the "Agreement") to renovate a historic commercial building in Springfield. Contractor presents ten points that challenge the evidence supporting its breach of the Agreement, the trial court's calculation of certain dam-

ages, and the trial court's refusal to award Contractor attorney fees and interest. We deny each of Contractor's points and affirm the judgment.

## Applicable Principles of Review

■ We must affirm the judgment in a bench-tried case "unless there is no evidence to support it, the judgment is against the weight of the evidence, or the judgment erroneously declares or applies the law." *McCullough v. Doss*, 318 S.W.3d 676, 678 (Mo. banc 2010). Even if we find error, we cannot reverse the judgment unless we also determine that the error "materially affect[ed] the merits of the action." Rule 84.13(b).[1]

■ "Substantial evidence is evidence which has probative force and from which the trier of fact could reasonably find the issues in harmony with its decision." *Grider v. Tingle*, 325 S.W.3d 437, 440 (Mo. App. S.D.2010).

> [A]n against-the-weight-of-the-evidence challenge presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact.

*Houston v. Crider*, 317 S.W.3d 178, 186 (Mo.App. S.D.2010).

■ We defer to the trial court's determination of the facts and matters of witness credibility such that "[t]he evidence and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded." *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534

(Mo.App. W.D.2000). As a result of this deference, "the judgment should be affirmed under any reasonable theory supported by the evidence." *Tower Prop. Co. v. Allen*, 33 S.W.3d 684, 688 (Mo.App. W.D.2000).

■ "Contract construction is a question of law and is reviewed *de novo* by this court." *Wildflower Cmty. Ass'n, Inc.*, 25 S.W.3d at 534. "Whether a contract is ambiguous is a question of law to be decided by the court." *Baker–Smith Sheet Metal, Inc. v. Building Erection Serv. Co.*, 49 S.W.3d 712, 716 (Mo.App. W.D.2001). A contract is ambiguous when a review of the entire contract would cause reasonable persons to differ on the construction of its terms. *Lobo Painting, Inc. v. Lamb Constr. Co.*, 231 S.W.3d 256, 258 (Mo.App. E.D.2007). "After determining that a contract is ambiguous, this Court can look to evidence outside the contract, such as testimony, to determine the parties' intent." *Id.*

## Facts and Procedural History

■ We focus on the facts necessary to decide the issues on appeal and present them in the light most favorable to the judgment. *See Wildflower Cmty. Ass'n, Inc.*, 25 S.W.3d at 534. Owner and Contractor entered into the Agreement on February 28, 2007. The brick building to be renovated ("the project") is located in downtown Springfield and was originally built between 1902 and 1905. One of Owner's principals, Jay Kenneth Martin ("Martin"), testified that the project involved a cost certification process used to obtain federal and state historic tax credits "to achieve any equity in the project [by] . . . fill[ing] the void between the value of the project and the actual cost of the project[.]"

---

1. Unless otherwise noted, all rule references are to Missouri Court Rules (2012).

The cash received from the sale of the tax credits is what makes these projects "economically viable." Contractor's Vice President, James Matthew Miller ("James Miller") testified that Contractor "special-ize[d] in historic tax credit projects." The Agreement was a "cost-plus" contract that contemplated a 12–month span from the issuance of a building permit to "Substantial Completion," defined as the issuance of an occupancy permit for the building, although the parties anticipated that occupancy could be possible in a shorter time frame.[2]

In March 2007, Owner leased the building being renovated to Inspired Commerce, LLC ("Tenant") under a 33–year "master lease" agreement. Martin was also a principal member of Tenant, which planned to sublease lofts and other parts of the building to subtenants. Tenant would begin making rent payments on the master lease on August 1, 2008, even though the building might not be "100 percent complete" at that time, and the master lease provided that Tenant would have possession by at least "the completion of [Owner's] Work" on or prior to December 31, 2008.

The master lease provided that Tenant's failure to notify Owner "of any defective or incomplete work" within 12 months of assuming possession of the building would be "conclusive evidence against Tenant" that the property, including Owner's work, "was then in good order and satisfactory condition." The master lease also required Tenant to make repairs to the building "at least equal in quality and cost to the original improvements[.]" Owner reserved the right to execute a mortgage against the building and to terminate the lease after five years with a termination payment "in the event of a sale or other direct or indirect transfer of all of [Owner's] interest in the [p]remises to an unrelated buyer on arms' length terms[.]"

The building permit for the project was issued on December 26, 2007, and the "certificate of occupancy" was issued just over a year later, on December 31, 2008. Work on the building continued through the "punch list stage" after the occupancy permit was issued in order to complete unfinished and "touchup" items that are not typically required before building occupancy. Contractor was paid for exterior tuck-pointing work, and James Miller knew that the specifications for the Agreement "clearly called to remove the mortar that was bad." Tuck-pointing is the process of finding, removing, and replacing loose mortar between bricks. Over time, the loss of mortar between bricks "can become a structural issue, because it has to hold the wall up."

Kim Buche[3] worked as an employee for Contractor on "the tax credit partnership" used to create equity for the project. She sent out cost-payment applications for the purpose of receiving payment from Owner, and she communicated with Owner's architect to get his approval for the payment applications. From looking at the cost certification information and the invoices, Buche determined that Contractor charged Owner $56,225.01 for labor and $5,514.05 for materials for "exterior tuck[-]pointing work[.]"

Contractor added "a burden rate" of 30 percent for construction labor on top of the hourly rate it paid to its employees work-

---

2. Contractor knew that Owner wanted occupancy sooner than twelve months, and Contractor thought they "could beat that one-year time frame. But as it turned out, we ran into, you know, we couldn't, we didn't."

3. We have chosen to use the spelling used by the witness as set forth in her email to Martin in January 2009, *infra*.

ing on the project in order to address amounts paid by Contractor for "Social Security, Medicare, Unemployment, Work Comp, [and] Payroll Processing." Buche said that her understanding of the components constituting the burden rate came from communication with Contractor's insurance company and its accountant. She could not recall the individual rates for the different elements such as social security, worker's compensation, or payroll processing.

Buche agreed that Owner's "Exhibit 29," admitted into evidence, was a "Cost Certification" that documented the final costs for the project as prepared by independent accountants. Exhibit 29 is set up in a spread-sheet format, and each page of the 25–page document bears the following text in the upper left-hand corner:

Missouri Department of Economic Development

Historic Preservation Tax Credit Program—Final Approval

List of Itemized Project Costs

The upper right-hand corner of each page, not including the first page, states:

Taylor Martin Holdings, LLC

Missouri Form HTC–E

MO Log# [number redacted]

The columns on the spread-sheet are entitled: "Category"; "Method of Payment"; "Date Paid"; "Vendor"; "Description"; "Work Completed"; "Rehab Eligible"; "Rehab Ineligible"; and "Category Total." Included under "Category" are entries for "General Labor" and additional entries reflecting labor activities appear under the associated "Description" column. The document does not bear any signature or attestation. The entries under "Date Paid" range from before the parties actually entered into the Agreement to an entry for Owner's "Developer Fee" in September 2009. The entries also reflect various pay-

ments Owner made to Contractor after Contractor was terminated in January 2009. Exhibit 29 reflected subtotals of $3,799.653.99 paid as "Rehab Eligible," $1,458,487.96 paid as "Rehab Ineligible," and a total of $5,258,141.97 for "Work Completed."

At some point, Martin became concerned about Contractor's labor charges, and while he did not provide a precise date for his inquiry, he said he requested an audit "at the very end of the relationship." When Contractor provided additional information about its labor charges, Martin discovered "that they were charging us an additional 30 percent[.]" He testified, without objection, that when he negotiated the Agreement, Matthew E. Miller ("Matt Miller," another of Contractor's principals) "even stated a case [that] if we have an $8 an hour guy cleaning up or doing something around there, we charge you $8. And then we [Contractor] make our 9 percent [for Contractor's Profit] on that." According to Martin, Matt Miller never mentioned 30% being added to amounts invoiced to Owner for labor, there was no negotiation for such a term, and Matt Miller caused Martin to believe that there would be no such additional cost.

After the audit, Martin told Buche that Owner had not agreed to pay an additional 30% on labor. Martin had agreed with Matt Miller during contract negotiations "that there would be a flat fee arrangement of $40,000 that would cover on-site supervision and management of the project." Martin's understanding was that all "supervisory or management personnel for [Contractor]" was covered by the $40,000 flat fee.

Martin testified as follows upon cross-examination about his review of Exhibit 29, the cost certification:

Q. All right. Have you had an opportunity—now, this is a document

that's been around a while. Have you had a chance to look at that?

A. I have looked at it. Not recently, but—

Q. All right. But to your best knowledge, it accurately represents the amounts paid by you in total—

A. Yes.

Q. —on this project?

A. Yes.

Q. All right. And I guess to some degree it was submitted to other parties for review?

A. Correct.

Q. All right. And to the best of your knowledge, it's true and accurate?

A. Yes.

Martin also agreed that Exhibit 29 was "what you submit to the Department of Economic Development" and that Owner received tax credits in return.

Martin testified that Contractor failed to provide "on-site supervision and management" for the project and that he gave notice of this to Contractor "[v]erbally, through emails, through meeting notes, [and] various means of correspondence." Martin described construction problems with the basement floor, "windows improperly installed and leaking . . . [and] tuck[-]pointing falling out of the building." Martin raised a problem with doors in the project in September 2008, but the job superintendent "didn't even notice that it wasn't correct[,]" and "[t]hey never fixed it." Contractor had an opportunity to resolve the problems with the doors before Owner terminated Contractor's services, and the replacement general contractor who came in after Contractor fixed the problem "[w]ithin about two days."

In October 2008, Martin advised Contractor that paint was peeling away from the exterior of the building after tuck-pointing was to have been completed, and he made a subsequent request for it to be corrected. The defect was not corrected. Martin had also advised Contractor of problems with roof leaks beginning in October 2008. As late as January 26, 2009, the roof was still leaking. Copies of emails addressing some of the problems that had been encountered during renovation were admitted into evidence as Owner's exhibits 1, 2, 12, and 23. Ultimately, Martin testified that Contractor was terminated for a "[c]ulmination of events."

Dan Johnson, Contractor's operations manager during the relevant time period, testified that Contractor hired a person to take the lead on tuck-pointing the building, but "[c]lose to the end" of the tuck-pointing work "[h]e was terminated for some insubordination[.]" Johnson agreed that all exterior areas that required tuck-pointing due to failing mortar were to be tuck-pointed and that peeling paint was an indication that tuck-pointing had not been done on a building. He testified that this building had "some peeling paint."

When Johnson heard someone saying that Contractor would not be finishing the project, he "picked up the phone and called [Martin] and asked him[,] 'is this true[?'.]" Martin said it was true; Contractor was "being dismissed." Martin testified:

I told [Johnson] I was quite upset. We had an issue that had gone unresolved for probably close to a year with a doorway opening. We were seeking a—we were down to a timeline to get a certificate of occupancy so that we could occupy our offices, which was coming much later than expected. And this doorway was not—the problem had not been remedied. It was a doorway that they had cut incorrectly. The door hadn't been—even been ordered for that opening yet, and we had been pushing and pushing to get the door fixed.

[The project manager for Contractor] had sent me an email [dated 1/28/09] that morning or the evening before, I believe, stating that that fix was going to cost us an additional sum of money. And that was sort of the straw that broke the camel's back.

In his conversation with Johnson, Martin also referred to his previous dissatisfaction with Contractor's performance on the project, and Johnson acknowledged the existence of the previous problems. Johnson did not recall Martin telling Contractor to get off the site or that they were being replaced. Johnson consulted with other employees of Contractor and then made the decision for the "guys to pack everything up and leave the job site" that same day.

On January 29, 2009, Buche sent an email to Martin that stated:

This is to confirm your conversation of this morning with Dan Johnson of [Contractor]. Effective immediately, [Owner] is terminating [Contractor]. Both parties waive the 10–day notification period as set forth in the [Agreement].

Please reply so that I know if I understood correctly or not. Thank you.

Buche testified that she consulted with counsel about the waiver language she put in the email, and while she maintained at trial that she was not waiving either notice or the opportunity to cure, she also said that the waiver language was included to avoid the possibility of Contractor continuing to work for another 10 days and then not receiving any pay for it.

On February 13, 2009, Buche received the following reply from Martin:

This is to confirm that [Contractor] was terminated as General Contractor

for gross default of the [Agreement] and thus for cause. The 10 day notice provision does not apply.

Contractor filed suit against Owner in June 2009. Its first amended petition (filed in February 2010) presented claims for a mechanic's lien,[4] quantum meruit, unjust enrichment, and breach of contract. Owner's third amended answer, filed in March 2011, included a counter-claim for breach of contract. Owner called a construction consultant, Roger Day, to testify about his inspections of the project and to give his opinions about defects he had observed. Day testified that the building's basement concrete "slab" floor had "[n]ot just hairline cracks, but some large cracks." The "control joints" appeared to be shallower than called for in the specifications, and "fiber expansion material mentioned in the specs" was not used. The combination resulted in cracking beyond the control joints. Day also observed "that in general the slab slopes away from the sump pump end of the basement." A "core sample" test was also performed on concrete from the floor. The sample "failed at 2,450 psi pressure." Day said that the strength specifications for the floor called for "3,500 psi" and that the minimum generally called for on interior slabs is "3,000 psi."

The specifications supplied with the windows for the building called for them to "be shimmed to be perfectly square and plumb" before being fastened in place. They also stated that "regular sealant" "or caulking" should be used around the windows. The 25 windows Day inspected were all installed with grout surrounding them instead of caulk. Because grout was used instead of caulk, the windows were

---

4. During trial and upon stipulation of the parties that the mechanic's lien was properly filed, the mechanic's lien was ordered re-

leased and funds covering a judgment related to the mechanic's lien were escrowed.

not able to expand and contract properly as moisture and temperature levels changed. Some windows were installed without any shims, and some window sills had not remained level. Some windows were shifting to the point that unpainted areas had become visible. According to Day, "The windows are basically destroying themselves."

Day "tested a couple dozen different areas" of bricks around the exterior of the building, "looking for tuck[-]pointing work. [He] did not find any new tuck[-]pointing. [He] found only the sandy, weak, existing mortar in every case." Day also said that his "method for remediation would require removing paint so that we could do the tuck[-]pointing. And then we would have to, after it's cured, recoat the building." Day's "Remediation Estimate," admitted into evidence as Owner's "Exhibit 40," included $69,170.00 to remove the basement floor and pour another one; $76,532.50 to "[r]emove, repair, refit, prep & reinstall 47 windows"; $123,925.00 to tuck-point 75% of the building; and $42,500 to "[p]repare, prime & recoat original building[.]"

Martin believed the building "without defect, to be worth $3.6 million." Martin testified that if he were to sell the building in the present condition, he would disclose both its defects and his opinion that its value had been diminished by the defects in the amount of $450,000. He agreed that he arrived at that figure by deducting "the cost to cure" from the "before" value, but he also felt that repair estimates provided by at least two experts "supported [his] independent determination as to value of diminution."

The trial court entered its judgment on June 6, 2011, incorporating findings of fact and conclusions of law. The trial court found that "[Owner] put [Contractor] on notice numerous times of its displeasure with [Contractor's] general contracting services. The trial record is saturated with testimony, emails and meeting notes where [Owner] advised [Contractor] of its failures and breaches and [Contractor] failed to address, correct or cure the material breach."

In its conclusions of law, the trial court stated that "[Owner] did not breach because of the over charges and improper billing and because of [Owner's] claims and defenses, the amount owed was not reasonably ascertainable." The judgment "awarded [Contractor] the sum of $44,153.40 on [its mechanic's lien claim] for services and materials provided by [Contractor] but not paid by [Owner,]" and denied Contractor's other claims, including its request for contractual attorney fees and interest.

"On [Owner's] [c]ounterclaim for breach of contract the [trial c]ourt award[ed] the sum of $197,112.56 for cost of repair and diminution of value of property and the additional sum of $75,179.33 for monies improperly billed by [Contractor], contrary to the written contact, which was paid by [Owner]" for a total judgment in favor of Owner in the amount of $272,292.12. The trial court then "offset" Owner's award by Contractor's award, deemed Contractor's judgment satisfied, and left "a remaining [net j]udgment of $228,138.72 for [Owner]." Other findings by the trial court will be described below as necessary to address the points challenging them.

## Analysis

### Point I—The Master Lease Did Not Preclude Owner from Being Damaged

■ Contractor's first point claims the trial court erred in awarding damages to Owner because "there is no evidence to support that [Owner] incurred any damages" resulting from Contractor's breach

of contract "because [Owner] conveyed a long term leasehold interest in the project to [Tenant]" before Contractor was terminated "and there is no evidence to support that [Tenant] claimed defects ... causing damages to [Owner]." Contractor argues that "the record contains no evidence that [Owner] was not paid rent in accordance with the lease agreement because of the alleged defects." Contractor argues that by the time the case was tried in March 2011, the one-year time frame for Tenant to complain to Owner about "defective work or incomplete work" had expired and that because Tenant otherwise assumed the maintenance and repair of the building under its lease, Owner "had no obligation or cost of ownership." We disagree.

Contractor analogizes to *Bell v. Bell,* 360 S.W.3d 270, 280–81 (Mo.App. S.D.2011) (where we would not ignore the legal consequences of husband titling properties in his name and claiming he owned them on an income tax return to find that husband did not own them for purposes of a division of property in a divorce), in arguing that we should not disregard "the legal consequence of the lease" that prevented Owner from repairing or maintaining the building during the term of the lease. Contractor's point overlooks that Owner had an interest beyond its right to collect rent.

In defending its right to damages, Owner relies on *Brouster v. Shell Pipe Line Corp.,* 16 S.W.2d 672, 674 (Mo.App. St.L.D. 1929), where the property owner was permitted to recover for "permanent injury" to its leased property after the tenant had already "been paid for the damage sustained by him" that resulted from a pipeline being laid across the leased property. Contractor attempts to distinguish cases permitting a landlord to sue for damage to a reversionary interest on the ground that any damages suffered by Owner would

only accrue at the time of the reversion, not now.

Contractor cites no authority and is not persuasive in claiming that harm to Owner for building defects is limited to rent lost due to those defects or that Owner could not suffer harm until the end of the lease. The lease did not purport to transfer all of Owner's property rights. Owner could sell or mortgage the building at any time, and it could terminate the lease early by paying a penalty. *Cf. White River Dev. Co. v. Meco Sys., Inc.,* 806 S.W.2d 735, 741 (Mo. App. S.D.1991) (owner entitled to damages for defects in constructed units even if already sold). Thus, Contractor's analogy to Bell is flawed.

Point I is denied.

### Point II—Termination Clause Did Not Control Damages for Breach

Contractor's second point asserts:

> The [trial c]ourt erred in finding for [Owner] on its counter claim for breach of contract because [Owner] was in default of its obligations under the [Agreement], and there is no finding or substantial evidence to support that [Contractor] was given notice or an opportunity by [Owner] to cure overcharges and improper billing to [Owner]. For this reason, [Owner] was in breach of its contract and therefore not entitled to relief for breach of contract.

Contractor acknowledges that the trial court found that Owner put Contractor on notice of dissatisfaction with Contractor's performance and that the trial court found that "testimony, emails, and meeting notes" documented that Owner informed Contractor of the breaches, which Contractor failed to cure. But Contractor argues that these notices were "not specific to the breach specified by the trial court as the basis for excusing [Owner] from its breach." The only portion of the

point asserting a particular breach by Owner is: "there is no finding or substantial evidence to support that [Contractor] was given notice or an opportunity by [Owner] to cure overcharges and improper billing to [Owner]."[5] The trial court found that "[Owner] did not breach because of the over charges and improper billing and because of [Owner's] claims and defenses, the amount owed was not reasonably ascertainable."

Contractor relies on Section 13.1 of the Agreement, which provides that Owner may terminate the Agreement "for convenience, on at least ten (10) days notice to Contractor" or for cause if Contractor defaults on "any material obligation" and "Contractor fails to commence cure of such default within ten (10) days after Owner's notice to Contractor (or if Contractor thereafter fails to diligently prosecute cure of such default with continuity to completion)[.]" It is not surprising that the trial court made no finding that Owner gave notice to Contractor with an opportunity to cure because it found instead that Buche, on behalf of Contractor, "waived the ten (10) day notice required for termination" on January 29, 2009. The trial court also properly announced and applied the law in concluding, for purposes of Contractor's demand for a termination fee as provided elsewhere in the Agreement, that "[w]aiver is the intentional relinquishment of a known right or privilege[,]" citing *Shahan v. Shahan*, 988 S.W.2d 529[, 534] (Mo. banc 1999), and that "[Owner] met its burden of establishing that [Contractor] intentionally relinquished a known contract right[.]"

"If waiver is implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." *O'Connell v. School Dist. of Springfield R–12*, 830 S.W.2d 410, 417 (Mo. banc 1992). The clarity of conduct must be such "that no other reasonable explanation of the conduct is possible." *Investors Title Co. v. Chicago Title Ins. Co.*, 983 S.W.2d 533, 538 (Mo.App. E.D. 1998). "The right to waive a condition operating in a party's favor extends to a provision which purports to effect an automatic termination of a contract." *Riggins v. City of Kansas City*, 351 S.W.3d 742, 749 (Mo.App. W.D.2011).

In its reply brief, Contractor argues that the email from Buche "does not contain a specific waiver of a ten-day notification pertaining to the opportunity to cure, or commence a cure at or prior to the termination." We disagree.

Buche affirmatively stated in her email, after consulting with legal counsel, that "[e]ffective immediately" Contractor was terminated and "[b]oth parties waive the 10–day notification period[.]" She further acknowledged that she did so to avoid any risk that Contractor would work at the site for an additional ten days and then not be paid for it. The trial court was not required to believe Buche's self-serving testimony that she was not intending to waive notice and an opportunity to cure when she included in her email the express language about waiving "the 10–day notification." *See Greentree Prop., Inc. v. Kis-*

---

5. In the argument that follows, Contractor asserts that "the counter claims made by [Owner] under a breach of [contract] claim[ ] cannot stand because [Owner] did not perform its payment obligation, and was not excused from performing its obligation because it did not provide notice to [Contractor] of the material default or allow [Contractor] to commence a cure of that default." "Arguments raised in the argument portion of the brief only and not included in the point relied on are not preserved for appeal." *Sexton v. Omaha Prop. & Cas. Ins. Co.*, 231 S.W.3d 844, 846 n. 2 (Mo.App. S.D.2007). Thus, any contention that Owner breached by failing to pay, as opposed to failing to provide notice and an opportunity to cure, is not properly before us, and we do not address it.

*see*, 92 S.W.3d 289, 292 (Mo.App. S.D.2002) (the trial court "is free to believe all, part, or none of the testimony of any witness"). That Martin's reply email maintained that he did not think notice was necessary because the termination was for cause does not change the fact that Contractor clearly and unequivocally waived its right two weeks earlier.

 In addition, Section 13.1 addresses the type of notice necessary to terminate the Agreement; it is silent as to what damages may be recovered as a result of such a termination. Damages are addressed in Section 14.5, which permits Owner "to seek any and all remedies available at law or in equity, including an award of monetary damages that arise directly from Contractor's alleged breach[,]" and this section of the Agreement contains no notice requirement.

The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent. *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995). The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning. *Id.; City of Harrisonville v. Public Water Supply Dist. No. 9 of Cass County*, 49 S.W.3d 225, 231 (Mo.App.2001). Additionally, each term of a contract is construed to avoid rendering other terms meaningless. *City of Harrisonville [v. Public Water Supply Dist. No. 9 of Cass County ]*, 49 S.W.3d [225,] 231[ (Mo.App.2001) ]. A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense. *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). Further, "[i]f the language of the agreement addresses the matter in dispute, the inquiry ends." *Stahlhuth v. SSM Healthcare of St. Louis*, 289 S.W.3d 662, 670 (Mo.App. E.D.2009). Section 14.5 is not limited by the requirements of notice or an opportunity to cure as described in Section 13.1.

Point II is denied.

### Points III and IV—Damages for Labor "Mark–Up" Charges

 We address together Contractor's related third and fourth points, which each address Contractor's collection of an additional 30% as a part of its labor charges. Point III contends the trial court erred in finding for Owner as to "monies improperly billed [Owner], as [Owner] paid for the labor costs of [Contractor] consistent with the [Agreement] and utilized these charges for purposes of obtaining tax credits on the project" such that Owner waived the right to deny the charges and seek reimbursement for them. Point IV contends "[t]he [trial c]ourt erred in denying [Contractor's] claim for full labor charges by reducing its labor charges by [30%] because this is inconsistent with the [Agreement] and [Owner] waived its right by utilizing similar charges for the purposes of obtaining tax credits on the project." [6]

---

6. Both points are multifarious as each addresses separate issues: 1) the permissible interpretation and construction of the Agreement; and 2) the possible waiver of any damages for such over-charging. "A point relied on violates Rule 84.04(d) when it combines multiple contentions not related to a single issue." *Morrow v. Fisher*, 51 S.W.3d 468, 473 (Mo.App. S.D.2001). Although such points fail to preserve anything for review, we may exercise discretion and reach the merits where the defects of the points do not otherwise impede our review, and we do so here. *See Sell v. Ozarks Med. Ctr.*, 333 S.W.3d 498, 506 n. 4 (Mo.App. S.D.2011).

Contractor argues on his third point that the Agreement clearly allowed Contractor to be reimbursed "for all labor cost[s,]" and that even Martin agreed that "FICA charges, unemployment charges, [and] worker's compensation charges are all a part of labor cost."[7] As support for his fourth point, Contractor reasons that although the trial court did not make a specific finding that stated how it calculated the $44,153.40 awarded to Contractor on its petition, the trial court must have reduced the amount Contractor was seeking by, among other things, 30% of the labor costs included in its unpaid invoices as demonstrated by the trial court's other findings. Contractor then argues that the trial court erred in making such a deduction for the same reasons that it erred in awarding Owner 30% of its paid labor charges as argued in support of Point III.

Article 5 of the Agreement governed the payment of the actual cost of the work, plus Contractor's fee. Section 7.1 provided, *inter alia*,

The cost of the [w]ork (the *"Actual Cost"* or the *"Cost of the Work"*) is all costs of labor, all costs of materials, supplies, fixtures, equipment and appliances, and all other costs, charges and expenses, directly incurred or expended by [Contractor] in the performance of the [w]ork on the [p]roject under or in furtherance of th[e A]greement; and includes (but is not limited to) the following:

(a) Wages of construction workers directly employed by [Contractor] performing work at either the site or an off-site workshop.

(b) Wages or salaries of [Contractor's] supervisory and administra-

tive personnel when stationed at the site.

(c) Wages or salaries of the Contractor's supervisory and administrative personnel when engaged in the business of the [p]roject, but only for the portion of their time required for this [p]roject, not to exceed $40,000.

. . . .

(p) Construction Management fee shall be capped at a maximum of $40,000 for the life of the project.

(Underlining as stated in original.)

Section 8.1 expressly excludes from "the [c]ost of the [w]ork" the "[s]alaries and other compensation of [Contractor's] personnel, other than those specifically provided for in *Sections 7.1(b) & (c)*"; "[e]xpenses of [Contractor's] principal office"; and "[a]ny general operating overhead costs of doing business not specifically deriving from [the A]greement." Section 8.1(a), (b), and (f). (Underlining as stated in original). The term "wages" is not defined in the Agreement.

The trial court found the Agreement "silent as to how wages are to be determined and [it] certainly does not make any reference to a 30% mark up." The trial court further found that Matt Miller never referred to a mark up in negotiations with Martin and that had Martin been informed of a mark up "he would have further negotiated the terms of the [A]greement." The trial court considered a common online dictionary definition for "wages" as being "a payment usually of money for labor or services usually according to contract on an hourly, daily or piecework basis—often used in plural[.]" *See* MERRIAM-WEBSTER,

7. With regard to his own employees, Martin agreed that he paid "contributions for FICA, Social Security, Medicare and unemployment" and while he believed that Contractor would recoup its similar expense from its Contractor's fee under the Agreement, he did not really "know where it was supposed to come from."

(October 16, 2012), *http://www.merriam-webster.com/dictionary/wage*. The trial court also observed that it was Contractor's "fault[,]" as the drafter of the Agreement, if it "failed to include the necessary language for [Contractor] to recover these expenses[,]" and reasoned that the reference in Section 7.1 to the cost of work as including "all costs of labor" was "insufficient to justify a 30% mark up of the wages ... when the [Agreement] has a specific provision addressing those wages[.]" The trial court then found "the mark up to be contrary to the terms of the [Agreement.]"

■■■ Contractor notes that unless the contract is ambiguous, the parties' intent is to be determined from the language of the contract itself, *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973), such that extrinsic evidence is used only in instances of an ambiguity, *id.*, and asserts that "if the [trial c]ourt deemed this provision to be ambiguous it certainly did not make such a finding in its findings of fact that the provision was ambiguous."[8] The trial court discussed the parol evidence rule with its principle that the trial court may consider evidence of oral negotiations that are consistent with the terms of the contract. Indeed, "the parol evidence rule does not apply to extrinsic evidence that does not contradict the actual terms of a complete and final agreement."[9] *Barone v. United Indus. Corp.*, 146 S.W.3d 25, 29 (Mo.App. E.D.2004). We also presume that the trial court knew and followed the law in considering evidence of the negotiations. *Cf.*

*Riley v. Headland,* 311 S.W.3d 891, 894 (Mo.App. S.D.2010).

■■■ Ultimately, whether the term "cost of the work" was ambiguous or not, the trial court did not err in denying Contractor the 30% mark up because Contractor had the burden to prove its damages to a reasonable degree of certainty. *See Rissler v. Heinzler,* 316 S.W.3d 533, 536–37 (Mo.App. W.D.2010). Buche testified that the 30% "burden rate" included fees for payroll processing in addition to taxes and insurance, and she could not state a breakdown of the individual figures within the burden rate. Thus, the 30% appears to reflect a mixed bag of costs based on a predetermined percentage and not the actual amounts attributable to each employee who directly worked on the project as called for by the Agreement. For instance, Contractor did not establish that the insurance rates were derived only from the work performed under the Agreement as required by Section 8.1(f), and Contractor did not prove that the payroll processing fees that made up a portion of the 30% markup were not the type of office expenses or general overhead excluded under Section 8.1(b) and (f). Therefore, it was not error to find that a flat 30% markup was not allowed under the Agreement. *Cf. Coale v. Hilles,* 976 S.W.2d 61, 68 (Mo.App. S.D.1998) (trial court's construction of contract was reasonable given its language and the evidence presented).

Contractor goes on to contend that "the more compelling error made by the [trial c]ourt, is [its] willingness to award damages on this issue even after [Owner] has utilized these charges for tax credit pur-

---

8. Although Contractor asserts that the trial court did not find the provision at issue ambiguous "in its findings of fact," whether a contractual provision is ambiguous is a question of law. *Baker–Smith*, 49 S.W.3d at 716.

9. Contractor did not voice any objection to Martin's testimony about his understanding of the wage rate he was agreeing to pay, let alone specifically claim that it was inconsistent with the terms of the parties' written agreement.

poses." Contractor maintains that the trial court used the same form (Owner's Exhibit 29) that Owner represented "to the taxing authorities" as "valid costs of the project in order to receive tax credits on those costs." Contractor again relies on the reasoning of *Bell*, 360 S.W.3d at 280–81, to argue that the trial court was thereby finding a fact contrary to the position Owner had previously taken with "the parties granting the tax credits" when it rejected Contractor's right to receive the 30% mark-up for labor.

Owner admits receiving tax credits, but argues this fact did not "clearly and unequivocally" demonstrate the intent to relinquish a contractual right, also citing *Shahan*, 988 S.W.2d at 534. Owner contends that its "Exhibit 29 is simply a 'List of Itemized Project Costs' and does not include any certification or representation within such document[,]" and Contractor "has not cited to any evidence regarding specific representations made by [Owner] in seeking those tax credits." Owner also asserts that Contractor has not shown "any evidence to indicate whether the tax credits were obtained before or after the labor audit was conducted."

It is not significant for our purposes that Exhibit 29 was not a certified document; Martin testified that it was a true and accurate statement of amounts paid by Owner and that it reflected the labor charges. Martin said he requested a labor audit near the end of the parties' relationship. The Agreement was terminated in January 2009, and Exhibit 29 reflects Owner's development fees paid in September 2009. As a result, it appears that the representation of labor charges set forth in Exhibit 29 was made after the labor audit was conducted. But simply paying what Owner had been billed—a portion of which was already paid before Martin questioned

the labor rates—does not "clearly and unequivocally" show that there was no other reasonable explanation for the conduct other than that it relinquished any right Owner had to attempt to recoup it. *Cf. Investors Title Co.*, 983 S.W.2d at 538.

Exhibit 29 makes no express statement that there is not or will not be any dispute with vendors or third-parties regarding any of the payment entries set forth in the document, and Contractor points to nothing suggesting that any such dispute or subsequent amendment or adjustment of the tax credit accounting is prohibited under the tax credit program. In other words, the trial court could reasonably have concluded that Owner sought tax credits based upon paid but disputed labor charges and would, presumably, make any necessary amendments and/or additional filings as required for tax credit purposes if and when a final judgment effectively returned a portion of those payments back to Owner. *Bell* is not applicable.

Points III and IV are denied.

*Points V & IX No Prejudice from Damages for Diminution in Value*

Points V and IX both assert that there was no substantial evidence to support the trial court's finding of diminution in value concerning specific parts of the building. The fifth point addresses the trial court's award for a 1% reduction in building value due to the condition of the basement floor; the ninth point challenges a 1.5% reduction in building value due to the condition of its windows. Contractor asserts that Martin's figures cannot support the diminution in value figures used by the trial court because he "simply testified to this amount based on the cost to correct estimate pre-

pared by Key Way [sic] Construction[.]"[10] Contractor also argues that the expert testimony at trial addressed only repair costs; it did not address diminution in value.

 "In situations where there is substantial but defective performance by a contractor, there are two standards for the measure of damages: cost of repair or replacement, and diminution of value. The particular facts and circumstances of the case determine which measure of damages is appropriate." *Stom v. St. Clair Corp.,* 153 S.W.3d 360, 364 (Mo.App. S.D.2005) (citations omitted). In defective construction cases, the cost of repair or replacement is favored as the normal measure of damages except when "unreasonable economic waste" results. *Business Men's Assurance Co. of America v. Graham,* 891 S.W.2d 438, 450 (Mo.App. W.D.1994). "In the instance where the cost of repair method would result in the destruction of usable property or would be grossly disproportionate to the results obtained, the owner's damages should be calculated by the diminution in value formula." *Id.* "Where there are a number of defects, the diminished value rule may be applicable to some and the cost rule to others." *County Asphalt Paving Co., Inc. v. 1861 Grp., Ltd.,* 908 S.W.2d 184, 186 (Mo.App. E.D. 1995). It is the contractor's burden to prove diminution of value, *Ken Cucchi Constr., Inc. v. O'Keefe,* 973 S.W.2d 520, 527 (Mo.App. E.D.1998), and unreasonable economic waste, *Business Men's Assurance Co. of America,* 891 S.W.2d at 450.

The trial court found that "it ha[d] sufficient information on the value of the building, the cost of the proposed repairs, the diminution of value of the building and the nature and extent of defective work to ascertain the pro rated share of the diminution of value of [the] property." The trial court found, based on Martin's testimony, that the building was worth $3.7 million "without defects" with a reduction in value of $450,000 "because of the poor work of [Contractor]." The trial court's "Conclusions of Law" go on to state that Martin's diminution figure was based on a cost of repair from Keyway Construction. The trial court found that removing and replacing the windows and the basement floor would constitute economic waste. As a result, it found that "1.5% diminution in value of $55,500.00" should be awarded concerning the windows and "1% diminution in value of $37,000.00" should be awarded for the basement floor.

 The trial court summarized Day's testimony about the basement floor, and it considered his cost of replacement estimate of $69,170.00. The trial court found that the floor was being used by the current occupant and that this fact "support[ed its finding] that removing the floor would constitute economic waste." The trial court also referenced an estimate from Keyway Construction, admitted as Exhibit 17, for the replacement of the floor. Because Contractor has not deposited Exhibit 17 with this court, we presume its content would not be favorable to Contractor's claim. *See O'Bernier v. R.C. & Assoc., Inc.,* 47 S.W.3d 422, 423 (Mo. App. S.D.2001).

The trial court's findings also summarized the testimony of the parties' experts

---

10. Additionally, Contractor interprets Martin's testimony concerning the value of the building to be that it was worth the same amount with and without the defects. Martin's testimony about diminution in value is somewhat difficult to follow, but that does not mean that the trial court was required to believe that Martin was admitting that the building suffered no loss in value as a result of its significant defects. *See Schubert v. Trailmobile Trailer, L.L.C.,* 111 S.W.3d 897, 899 (Mo.App. S.D.2003) (trial court "is free to believe none, part, or all of the testimony of any witness").

concerning the windows. Contractor's expert did not believe that the windows needed to be removed in order to be repaired, but he was "vague in the nature and detail of the repair[.]" Owner's expert, Day, "on the other hand, was detailed and gave a specific, written estimate of cost of remediation [$76,532.50] for all of his proposed repairs." The trial court also referenced "an estimate from Keyway Construction, LLC for the removal and reinstallation of the windows[,]" admitted as Owner's Exhibit 17. We again presume that the exhibit would support the trial court's judgment as Contractor did not deposit it with us for our consideration. *Id.*

■■ Here, the trial court could award some damages based on cost of repair and other damages based on diminished value because there were a number of defects. *See County Asphalt Paving Co., Inc.,* 908 S.W.2d at 186. Contractor points to no evidence concerning diminution in value attributed to the windows and the basement floor, but it was Contractor's burden to do just that in order to avoid damage amounts based on the cost of repairing those items. *See Business Men's Assurance Co. of America,* 891 S.W.2d at 450. "[T]he trial court is not required to apply the diminished value measure of damages where the contractor does not meet its burden of production." *Stom,* 153 S.W.3d at 365.

Thus, in the absence of such evidence from Contractor, the trial court would have been justified (consistent with its oth-er factual findings regarding costs of repair) if it had awarded Owner a *larger* amount of damages—$76,532.50 for the windows and $69,170.00 for the basement floor. "It is elementary that error without prejudice is not grounds for reversal." *Arndt v. Beardsley,* 102 S.W.3d 572, 576 (Mo.App. S.D.2003) (reversal not required where evidence supported higher damages award and lower damages award was ordered); *see also* Rule 84.13(b). "It is clear that the error must adversely affect the *complaining party." Arndt,* 102 S.W.3d at 576. (Emphasis as stated in original). As a result, Contractor was not prejudiced by the trial court's award of a lower amount.[11]

Points V and IX are denied.

### Points VI and X—Tuck-pointing and Repainting Damages Not Erroneous

Contractor's sixth point contends "[t]he [trial c]ourt erred in finding that [Owner] had been damaged due to [Contractor's] failure to tuck-point the exterior of the building" and asserts three reasons for the error: the trial court misconstrued the Agreement, there was no substantial evidence that Contractor was paid for tuck-pointing that it did not do, and such a finding is also against the weight of the evidence.[12] We will consider this point with Contractor's tenth point, which contends that it was error to award $21,250 for painting because the Agreement "did not allow for the award of consequential damages."

---

11. In the "Conclusions of Law" portion of its judgment, the trial court stated that "in developing his opinion of cost to cure the faulty work" Day "applied consequential costs and damages that were not provided for or allowed under the [A]greement between [Owner] and [Contractor]." Contractor's points V and IX do not contend that the costs of repair as stated by Day could not be used for an award based upon repair instead of diminution of value.

12. The point is multifarious in asserting separate issues, *see* Rule 84.04(d) and *Morrow,* 51 S.W.3d at 473, but we exercise discretion to separate the issues instead of dismissing the point.

Contractor's sixth point fails to comply with Rule 84.04(d)(1)(C) as it does not explain, in the context of the case, how the trial court misconstrued the Agreement. *See Crawford Cnty. Concerned Citizens v. Missouri Dept. of Nat. Res.*, 51 S.W.3d 904, 908 (Mo.App. W.D.2001) (a point that does not explain the legal reasons supporting its claim of error preserves nothing for appeal). We may nonetheless exercise discretion to review the matter if the noncompliance does not impede our review. *See Kieffer v. Gianino*, 301 S.W.3d 119, 120 (Mo.App. W.D.2010). Here, we cannot follow Contractor's analysis that the trial court must have construed the Agreement to be "fixed[-]price" as to tuck-pointing when it also acknowledges that the trial court found the Agreement to be a cost-plus contract and that the damages were "for defective tuck-pointing." Contractor's failure to clearly state its complaint and support it with relevant legal authority impedes our ability to review the claim of error, and we consider this portion of the point no further. *See Atkins v. McPhetridge*, 213 S.W.3d 116, 121 (Mo.App. S.D.2006) (where we declined to consider parts of a defective point as though they were independent points on appeal and instead focused on those portions that did not require us to become an advocate for either side).

As to Contractor's contention that the trial court's finding that Owner was damaged due to a "failure to tuck-point the exterior of the building" was not supported by the evidence and was against the weight of the evidence, both challenges require Contractor to identify the "factual proposition" that "is necessary to sustain the judgment[.]" *Houston*, 317 S.W.3d at 187. Based on a finding by the trial court that "[Owner] was not charged for areas that were not tuck[-]pointed[,]" Contractor argues Owner was awarded damages for defective tuck-pointing that was never actually undertaken.[13] But the critical factual proposition supporting the trial court's award is not whether Contractor was obligated to tuck-point 100% of the building; it is whether the tuck-pointing actually performed by Contractor was defective.

Contractor's own witness, Buche, testified that Contractor was paid $61,739.06 for exterior tuck-pointing. Martin testified that the building began to show peeling paint in 2008 after it was to have been tuck-pointed and painted. And Day testified that his inspections revealed no indication of any new tuck-pointing, only the remnants of old, failing tuck-pointing. Day also testified that he saw evidence of failing mortar on all four sides of the building. The trial court was entitled to accept his testimony, see *Wildflower Cmty. Ass'n, Inc.*, 25 S.W.3d at 534, and it constitutes substantial evidence supporting the trial court's finding that the expert "was unable to locate any portions of the building that had been tuck[-]pointed properly on his numerous inspections of the exterior of the building." In other words, the trial court could find from the evidence adduced that whatever Contractor did in tuck-pointing the building (and charging Owner for such work) was insufficient to

13. Contractor also argues that while it "did not engage the tuck-pointing work consistent with the specifications of the contract, which required a tuck-pointing specialist[,]" this was because "the parties clearly changed this provision" so that Contractor's employees would be responsible for the work. This does not advance Contractor's argument because, regardless of the specification of the means of performance of the work, Contractor was still responsible to Owner for the work performed. In Missouri, construction contracts carry an implied requirement that the work will be performed "in a skillful and workmanlike manner[.]" *L.L. Lewis Constr., L.L.C. v. Adrian*, 142 S.W.3d 255, 261 (Mo.App. W.D.2004).

address the actual problems with the tuck-pointing so as to satisfy Contractor's obligation under the Agreement. Contractor fails to explain why the trial court could not conclude from the evidence that Owner was charged for defective tuck-pointing.

Further, Contractor fails to demonstrate that the testimony of Day and Martin were "so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief" as required in an against-the-weight-of-the-evidence challenge. *Houston*, 317 S.W.3d at 187. Contractor agreed that all areas of the building that needed tuck-pointing were to be tuck-pointed, and its own witness, Johnson, conceded that the building had peeling paint—a sign he agreed indicated that tuck-pointing had not been done.

Contractor points to Martin's testimony that the peeling paint problem related to problems with tuck-pointing and Day's testimony that "remediation" of tuck-pointing required removal of the existing paint and "recoat[ing]" with "breathable paint" as supporting its Point X argument that repainting is a consequential damage prohibited by Section 14.5 of the Agreement. Section 14.5 provides:

> In the event that Contractor ... is in breach of th[e] Agreement, then [Owner] shall be entitled to seek any and all remedies available at law or in equity, including an award of monetary damages that arise directly from Contractor's alleged breach; provided, however, that notwithstanding anything herein to the contrary, [Contractor] shall not be liable to Owner for damages, losses, or expenses arising *only indirectly or consequentially* from Contractor's acts or omissions. (Emphasis added.)

Day estimated that $42,500 would be necessary to "[p]repare, prime & recoat original building[.]" The trial court's award of damages for this part of the repair was one-half that estimated amount. Owner asserts "that the requirement to repaint the building was a direct result of the improper tuck-pointing and a proper part of the damages recoverable under the 'cost rule' [referring to damages for the cost to repair or replace a defective item]." We agree.

As discussed above, the appropriate method of measuring damages for breach of contract by defective performance is either cost of repair or diminution in value. *Stom*, 153 S.W.3d at 364. "[C]ost of repair" "as its name implies, [is] the cost of repairing the defective work." *Hensic v. Afshari Enter., Inc.*, 599 S.W.2d 522, 524 (Mo.App. E.D.1980). "Repair costs are not 'incidental' or 'consequential' damages." *Farning v. Brendal*, 150 S.W.3d 384, 386 (Mo.App. W.D.2004) (in a breach of warranty case, cost of repair was the proper measure of damage when less than diminution and such repair costs could not be considered as a part of consequential damages recoverable in addition to damages based on diminution in value). The trial court did not err in finding that at least some repainting would be a necessary part of repairing the defective the tuck-pointing. *Cf. L.L. Lewis Constr., L.L.C.*, 142 S.W.3d at 261 (cost of adding steel beams and other supports to remediate problem of sagging caused by defective construction "is clearly a repair cost," instead of "an 'additional cost' ").

Points VI and X are denied.

### Point VII—Contractor Not Entitled to Attorney Fees

Contractor's seventh point asserts the trial court erred in denying attorney fees under the Agreement

> on the basis that [Contractor] was not [the] prevailing party, because the

[Agreement] did not provide for reasonable attorney fees to be awarded to [Owner] and therefore damages awarded to [Owner] should not have been off set [sic] against [Contractor's] award of damages in the determination of the prevailing party.

The trial court found that "[a]lthough the facts support that [Contractor] has incurred attorney fees in the amount of at least $25,000 this amount is not awarded given that [Contractor] is not the prevailing party."

Contractor relies on Section 14.7 of the Agreement, which provides that:

In the event that either party brings any action or proceeding ... for any alleged breach of or default under the Agreement, or any other action arising out of the Agreement ... then [Contractor] shall be entitled to an award of reasonable attorney's fees ... incurred in such action or proceeding ... regardless of whether such action proceeds to final judgment.

Contractor argues that the trial court did not find this provision ambiguous and that "the [trial c]ourt's conclusion of law misconstrues the [Agreement.]" In response, Owner first quotes *Flamingo Pools, Spas, Sunrooms & More Store, Inc. v. Penrod,* 993 S.W.2d 588, 590 (Mo.App. S.D.1999), for the principle that "[a] party may only recover attorney's fees under a contract provision if it is the prevailing party[,]" and then quotes *Ken Cucchi Constr., Inc.,* 973 S.W.2d at 528, to add that this is so "even if the contract is silent on the issue[.]"

 Because we are concerned with the correctness of the trial court's ruling, not the means by which it reached it (*see Business Men's Assurance Co. of America,* 984 S.W.2d at 506), we do not need to determine whether Contractor had to be the prevailing party in order to recover its attorney fees under Section 14.7 of the Agreement. "It is elementary that a party to a contract cannot claim its benefit where he is the first to violate it." *Boten v. Brecklein,* 452 S.W.2d 86, 92 (Mo. banc 1970). *See also ArtCraft Cabinet, Inc. v. Watajo, Inc.,* 540 S.W.2d 918, 926 (Mo.App. K.C.D.1976) (party that first breached the contract "may not claim the benefit of a contract by insist[ing]" that the other party comply with a condition precedent in the contract). "A breach of an agreement by one party will excuse the other party's performance, however, only if the breach is material." *Barnett v. Davis,* 335 S.W.3d 110, 112 (Mo.App. W.D.2011). The materiality of a breach is a question of fact. *Classic Kitchens & Interiors v. Johnson,* 110 S.W.3d 412, 417 (Mo.App. S.D.2003).

Here, the trial court found that Contractor had breached the Agreement and that Owner had not. The trial court found in favor of Contractor only on its mechanic's lien claim.[14] Although Contractor was found to have "completed substantial performance of its obligations under [the A]greement" upon the issuance of the occupancy permit and commencement of "the punch[-]list stage[,]" this did not necessarily require the trial court to find that Contractor had not materially breached the Agreement.

The doctrine of substantial performance expresses the presumption that the exchange contractors expect from each other is that of a reasonable perform-

14. The trial court stated that since Contractor's claims for its other counts were "duplicative in regards to unpaid services and materials no relief is granted[,]" and the trial court further denied Contractor's request for "an award of a termination fee" under its breach of contract claim.

ance. Restatement (Second) of Contracts § 241 comment b (1981). Thus, the doctrine operates when the defects in performance are sufficiently slight that damages will complete the contract. 17A Am.Jur.2d *Contracts* § 632 (1991). A material defect or failure in performance, however, is not a reasonably expected performance, and so operates to prevent the duty of the other party to perform from becoming due.

*Health Related Serv., Inc. v. Golden Plains Convalescent Ctr., Inc.*, 806 S.W.2d 102, 104 (Mo.App. W.D.1991). *Cf. County Asphalt Paving Co., Inc. v. 1861 Group, Ltd.*, 851 S.W.2d 577, 579 (Mo.App. E.D. 1993) (deviation from paving contract specifications constituted material breach even though portions of parking lot were usable).

Although we did not see express findings of fact identifying particular instances of breach as being material, the trial court referred to this degree of deficiency in describing Owner's efforts to inform Contractor "of its failures and breaches and [Contractor] failed to address, correct or cure *the material breach*." (Emphasis added.) The trial court also found that "[Owner] presented undisputed evidence [that Contractor] failed to adhere to the [Agreement] documents in performing its construction work"; and Contractor's "mark up" for labor charges was "contrary to the terms of the [Agreement.]" Further, as noted in our discussion of the damages awarded under points V, VI, IX, and X, *supra*, the damages found by the trial court for breach of contract by Contractor (before offset by the amount awarded Contractor on its mechanic's lien claim) in the amount of $272,292.12—approximately 8% of the building's value—

hardly suggests a slight breach of its contractual obligations.

▮▮▮ Thus, we consider that the trial court found, as a matter of fact, that Contractor had materially breached the Agreement. *Cf. Classic Kitchens & Interiors*, 110 S.W.3d at 417–18 (in the absence of a finding that contractor was in material breach of contract, sufficient evidence existed for the trial court to have found that contractor did not materially breach the contract and was deemed to have found that contractor did not materially breach the contract). Thus, Contractor was not entitled to enforcement of the attorney fee provision in the Agreement it had materially breached.

Point VII is denied.

### Point VIII—Contractor Not Entitled to Interest Award

▮▮▮ Contractor's eighth point contends the trial court erred in denying interest on the amounts not paid by Owner on the ground that Contractor was not the prevailing party "because [the Agreement] provisions did not provide for interest to be awarded to the prevailing party." The trial court found that "interest should not accrue because the amount was not ascertainable and because [Contractor] is not the prevailing party." And, as previously discussed, it found that while Owner had not paid $44,153.40 for "outstanding work, contractor fees, labor and materials provided[,]" it also found that Owner had overpaid labor charges in the amount of $75,179.33.

Contractor maintains that "the [trial c]ourt reached no determination of finding that [Section] 14.4 of the [Agreement] was ambiguous."[15] Section 14.4 provides that

---

15. For the reasons already discussed, Contractor does not demonstrate that such a finding was specifically requested and thereby

required. *Cf. McCullough*, 318 S.W.3d at 678.

"[p]ayments due and unpaid under this Agreement shall bear interest from the date the payment is due until the actual date of payment, at an interest rate which is the lesser of eighteen percent (18%) per annum, or the highest possible rate allowed under law." Owner argues that "[a]s the [trial c]ourt found that [Owner] was only owed $44,153.40 but was overcharged $75,179.33, it is clear that [Owner] did not owe any amounts under Section 13.2 [of the Agreement]"—the provision of the Agreement addressing the calculation of amounts owed after termination—and that as a result, "there were no amounts upon which to base an award of prejudgment interest."

Once again, we do not need to decide whether a "prevailing party" rule should be applied to the contractual provision providing for an award of interest on "payments due and unpaid" [16] because, as set forth in our analysis of Point VII, Contractor cannot claim the benefit of a provision in an agreement it has materially breached. *See Boten,* 452 S.W.2d at 92.

Point VIII is also denied, and the judgment of the trial court is affirmed.

JEFFREY W. BATES, J., and DANIEL E. SCOTT, P.J., Concur.

---

**16.** In any event, Owner had paid Contractor much more than was owed. *Cf. Good Hope Missionary Baptist Church v. St. Louis Alarm Monitoring Co., Inc.,* 358 S.W.3d 528, 534 (Mo.App. E.D.2012) (applying section 408.040, RSMo Cum.Supp.2011 and holding that because an award of interest is to compensate a party for the loss of use of money, interest should therefore not accrue on money already paid as the recipient had the use of that money).